TEXAS CERTIFIED COTTONSEED BREEDERS ASSOCIATION V. C. C.
ALDRIDGE, TRADING AS ALDRIDGE COTTONSEED FARMS.

No. 6507.   (Application No. 19,600).   Decided May 31, 1933.
(61 S. W., 2d Series, 79.)

*C. K. Bullard* and *E. F. Kucera,* of Dallas, for plaintiff in error.

Appellant Association had the right to use its own best judgment and discretion as to making sales of its members' cottonseed as shown by the marketing contracts and, hence, the defense urged by appellee was not permissible without an allegation and showing of fraud or gross negligence, neither of which is alleged or shown.

The agreed statement of facts shows that appellant labored diligently to sell its members' cottonseed, including that of appellee (prior to the time it burned), but that because of distressed economic conditions it was not able to sell them to any better advantage. California Bean Growers Association v. Rindge Land & Navigation Company, 199 Calif., 168, 248 Pac., 658; Northwestern Hay Association v. Hanson, 134 Wash., 668, 236 Pac., 561.

The right of a co-operative marketing corporation to recover excess advances, or over payment, to its members on crops delivered to it under the so-called written Marketing Contract, has not heretofore been before the courts of Texas.

However, the general rule or underlying principle that no man shall be allowed to enrich himself unjustly at the expense of another or retain money that in "equity and good conscience" belongs to another, has been approved by the Texas courts, and elsewhere.

The following Co-operative Marketing cases decided by the courts of other states require the refunding of such excess, or overpaid, advances: Ark. Cotton Growers v. Brown, 16 S. W. (2d) 177; Calif. Raisin Grs. v. Abbott, 160 Calif., 601,

117 Pac., 767; Sugar Loaf Orange Grs. v. Skewes, 47 Calif. App., 470, 190 Pac. 1076; Calif. Bean Grs. v. Williams, 82 Calif. App., 434, 255 Pac., 751; Lake Charles Rice Mills v. Pacific Rice Grs., 295 Fed., 246; Farmers Union, Etc., v. Schultze, 112 Kan., 675, 212 Pac., 670.

*Clark, Harrell & Clark,* of Greenville, for defendant in error.

The contract out of which this suit arose is an absolute sale by appellee to appellant of all of the cottonseed delivered by appellee thereunder. Hopkins v. Partridge, 71 Texas, 606; Texas Farm Bureau Assn. v. Stovall, 113 Texas, 273, 253 S. W., 1101.

MR. JUDGE SHARP of the Commission of Appeals delivered the opinion for the court.

The Texas Certified Cottonseed Breeders' Association filed this suit against C. C. Aldridge to recover a certain sum of money alleged to have been an advancement on certified cottonseed delivered by C. C. Aldridge to the association pursuant to a certain marketing agreement executed by them. The case was tried before the court without a jury upon an agreed statement of facts and judgment was rendered by the court in favor of Aldridge. The Court of Civil Appeals at Texarkana affirmed the judgment of the trial court. 59 S. W. (2d) 320. A writ of error was granted.

The principal question presented for decision in this case is: Is the contract in controversy a contract of absolute sale, or is it a contract of agency? An answer to this question turns upon the construction of Chapter 8, Title 93, Articles 5737 to 5764 enacted in 1921, commonly known as the Co-Operative Marketing Act (R. C. S., 1925), under which the Texas Certified Cottonseed Breeders Association was created and the contract executed by its members involved here. It is not free of difficulty. Some of the outstanding purposes for which the law was enacted are listed below. The Act provides, *inter alia*, that the policy of the law is stated that "in order to promote, foster and encourage the intelligent and orderly marketing of agricultural products through co-operation and to eliminate speculation and waste; and to make the distribution of agricultural products as direct as can be efficiently done between producer and consumer; and to stabilize the marketing problems of agricultural products this law is passed." Article 5740 declares the purposes for which the Act was enacted and it provides that "an association may be organized to engage in any activity in con-

nection with the marketing or selling of the agricultural products of its members." In Article 5742 the powers of the association are set forth, among other things, as follows: "(a) To engage in any activity in connection with the marketing, selling, * * * storing, handling or utilization of any agricultural products produced or delivered to it by its members. * * * No association, however, shall handle the agricultural products of any non-member. * * * (c) To act as the agent or representative of any member or members in any of the above mentioned activities. * * * (g) To do each and every thing necessary, suitable or proper for the accomplishment of any one of the purposes or the attainment of any one or more of the objects here enumerated; or conducive to or expedient for the interest or benefit of the association; and to contract accordingly; and in addition to exercise and possess all powers, rights and privileges necessary or incidental to the purposes for which the association is organized or to the activities in which it is engaged; and in addition, any other rights, powers and privileges granted by the laws of this state to ordinary corporations, except such as are inconsistent with the express provisions of this Act; and to do any such thing any where." The Act further provides who may become members of the association; how the association may incorporate; for the adoption of by-laws; the election of directors, and other steps necessary to govern and control the association in its operations.

In Article 5753 it is provided that "the association and its members may make and execute marketing contracts, requiring the members to sell, for a period of time, not over ten years, all or any specified part of their agricultural products or specified commodities exclusively to or through the association or any facilities to be created by the association. The contract may provide that the association may sell or re-sell the products of its members, with or without taking title thereto; and pay over to its members the re-sale price, after deducting all necessary selling, overhead and other costs and expenses, including interest on preferred stock not exceeding 8% per annum and reserves for retiring the stock, if any, and other proper reserves."

The Texas Certified Cottonseed Breeders Association is a non-stock, non-profit co-operative marketing corporation, organized under the above described law on March 4, 1930, by certain state certified cottonseed breeders or growers. C. C. Aldridge is a producer and breeder of state certified cottonseed. Following the incorporation, Aldridge, along with other cotton-

seed breeders, executed what is known as the standard market-
ing contract covering the marketing of cottonseed and thereby
became a member of the association. At the time of the execu-
tion of the marketing contract Aldridge had 11,916 bushels of
1930 certified cottonseed and delivered the same to the associa-
tion by turning them over to a bonded warehouse located at
his residence and taking a receipt therefor and forwarding
same to the association. Thereafter, on March 6, 1931, a re-
newal or extension of the marketing contract was entered into
by and between Aldridge and the association, which merely
included certain changes respecting the rights of withdrawal
of members. The pertinent parts of this contract read as
follows:

"1. The Association buys and the Breeder sells and agrees
to deliver to the Association all the Texas State Certified Cot-
tonseed now on hand or produced by or for him or acquired by
him as landlord or lessee during the period of ten years fol-
lowing the date of this contract, unless this contract is ter-
minated as hereinafter provided. . . .

"2. All Texas State Certified Cottonseed shall be deliv-
ered to the Association as soon as practicable after the gather-
ing thereof at such warehouse as may be approved and desig-
nated by the Association. On the delivery of said Texas State
Certified Cottonseed to such a warehouse, negotiable warehouse
receipts covering the same shall be issued in favor of the Asso-
ciation and promptly delivered thereto, which warehouse re-
ceipts shall in and of themselves pass title thereto to the Asso-
ciation.

"3a. The Association shall resell, on such terms and condi-
tions and by such ways as the Board of Directors of the Asso-
ciation may deem advisable, all Texas State Certified Cotton-
seed delivered to it by the Breeder and by other Breeders under
similar contracts at the best prices obtainable by it under mar-
ket conditions and will pay over to the Breeder the net amount
received therefrom, less freight, insurance and interest and
after deducting the cost of maintaining and operating the Asso-
ciation, the cost of advertising such seed and all costs and
expenses incident to the handling, storing and marketing
thereof, including a deduction of not to exceed ten per cent
of its gross resale price for reserves which may be used by the
Board of Directors of the Association for any Association pur-
pose; provided, however, such reserves shall remain the prop-
erty of the Breeder and shall be refunded, at book value, at
such times as the Board of Directors in its conclusive discretion

shall determine. It is specifically agreed, however, that in no event shall more than fifty (50%) per cent of any such reserve be invested in physical properties.

"b. Any deduction or allowance or loss that the Association may make or suffer on account of inferior grade, quality or condition of said cottonseed at delivery shall be charged against the Breeder individually.

"4. The Association may, in the conclusive discretion of the Board of Directors, establish pools on a daily, monthly and/or seasonal basis and/or with respect to the varieties and grades of Texas State Certified Cottonseed delivered by its members and may make such rules and regulations in connection therewith as may be deemed advisable. The proceeds from the sale of all Texas State Certified Cottonseed in any pool, less the deductions and expenses set forth in paragraph 3a hereof, shall be divided ratably among the 'Breeders,' in proportion to the amount of such cottonseed delivered by them which is sold in any such pool. Payments to Breeders shall be made from time to time until all of the accounts are settled in full. If said cottonseed is not sold during the season in which it is delivered to the Association it may, in the discretion of the Board of Directors of the Association be carried over to the following season or seasons.

"5. The Breeder agrees that the Association in its name may borrow money on any or all said Texas State Certified Cottonseed in its possession through drafts, acceptances, notes, or otherwise, or on any warehouse receipts or bills of lading, or upon any accounts for the sale thereof, or upon commercial paper delivered therefor; and that, in addition, the Association may pledge the same as security for any of its obligations. Association shall distribute the money so borrowed, as advances or partial payments, equitably among the Breeders in proportion to their deliveries to the Association, or may use any part thereof in the proper operation of its business, as the Board of Directors thereof may determine in its conclusive discretion."

The facts agreed to are as follows:

"That pursuant to said membership and the execution of the above and foregoing marketing agreement, the Defendant and the other members of Plaintiff Association, delivered to Plaintiff Association, 297,358 bushels of State Certified Cottonseed, which included 11,916 bushels delivered by the Defendant, C. C. Aldridge, all of which cottonseed was produced during the year 1930 and which was delivered to the Association in bonded warehouses located near the residence of each of said

breeders, and uniform bonded warehouse receipts issued and delivered to Plaintiff Association therefor in the name of the Association; and that said cottonseed was culled and treated with a chemical known as 'Ceresan' to preserve the germinating qualities thereof, and sacked prepared for shipment to cotton producers over the State for planting purposes all as directed by the Association.

"That the Plaintiff Association, on or about the 1st day of January, A. D. 1931, in pursuance to said written Marketing Agreement made application to and secured a loan from the Federal Intermediate Credit Bank of Houston, Houston, Texas, in the sum of $307,128.80 on the basis of $1.10 per bushel; and that out of the proceeds of said loan $1.00 per bushel thereof was advanced to all of said members pro rata on said cottonseed delivered by them to Plaintiff Association, save and except 18,150 bushels delivered by the member E. K. Russell of Annona, Texas, which said seed delivered by E. K. Russell was not pledged to said bank nor did said member receive any advance payment thereon.

"That the Defendant, C. C. Aldridge, was paid $11,916.00 as an advancement out of said proceeds on the 11,916 bushels of cottonseed delivered by him to Plaintiff Association, as evidenced by a voucher of Plaintiff Association issued January 30, 1931, which was endorsed and cashed by Defendant.

"That all of the cottonseed delivered by the members of the Plaintiff Association, including this Defendant, was handled, sold and accounted for in one general pool, where all sales proceeds were averaged, after deductions were made in accordance with said written marketing contracts whereby the average net sale price of said cottonseed due each member, including defendant, was $.20737 per bushel. That Plaintiff Association in selling said cottonseed sold 123,613 bushels thereof for planting purposes to cotton farmers during the 1931 and 1932 crop years. That there were 26,506 bushels destroyed by fire, of which 11,601 bushels were cottonseed delivered to the Association by Defendant and 14,905 bushels delivered to it by the said E. K. Russell. That in the summer of 1932 it sold the remaining cottonseed on hand, to-wit: 147,239 bushels, to commercial oil mills in Texas at the current oil mill prices.

"Plaintiff Association was not able to sell and dispose of all of said cottonseed for planting purposes, notwithstanding all of its efforts put forth to induce the farmers to buy the same, which inability was largely due to the financial inability of cotton farmers to purchase the same on account of the great stress

of economic conditions throughout the country, and that Plain-- tiff Association, its agents, servants and representatives, used all due diligence to sell said cottonseed and that its failure to sell the same was not due to any negligence on its part; that Plaintiff was unable to sell all of said cottonseed for planting purposes for the 1931 and 1932 planting seasons, and that the remainder thereof could not be carried over for the 1933 planting season due to the fact that the germinating quality of the same had decreased to the extent that the same would not be suitable for planting purposes.

"That the cottonseed of the Defendant and all other members of Plaintiff Association was insured and that on, to-wit: June 24, 1931, 11,601 bushels of the cottonseed which was by the defendant turned over to the bonded warehouse at Plano, Texas, and the receipt therefor delivered to the Association, was burned, and that plaintiff Association collected insurance thereon in the sum of $20,301.75, being on the basis of $1.75 per bushel, the agreed insurance value, and that said proceeds were placed by Plaintiff Association with the proceeds realized by it from the sales proceeds of the other members' cottonseed in the general, or common pool.

"That Plaintiff Association has made demand upon Defendant to refund to it the sum of $9,444.23, being the amount of overpayment on said cottonseed, but that, although often requested, Defendant has failed and refused and still fails and refuses to pay the same, or any part thereof."

The march of events brings new ideas and new problems which call for the enactment of laws to meet the necessities of the new conditions. The co-operative marketing idea gripped the public mind and was a favorite topic for thought by economists and lawmakers. Practically every state in the Union adopted in some form co-operative marketing statutes. Texas was one of the first to enact the Co-Operative Marketing Act. Likewise, the Congress of the United States passed similar laws. Clayton Act, October 15, 1914, chap. 323, 38 Stat. at L. 730; the Capper-Volstead Act, February 18, 1922, chap. 57, 42 Stat. at L. 388, U. S. C., Title 7, secs. 291, 292 (7 U. S. C. A., secs. 291, 292); and the Co-Operative Marketing Act of July 2, 1926, chap. 725, 44 Stat. at L. 802, U. S. C., Title 7, sec. 414-1 et seq. (Mason's), U. S. C. A., secs. 451-457. The legality of the co-operative statutes and contracts executed thereunder have been upheld by both federal and state courts. Furthermore, the courts have liberally construed the marketing acts in order to accomplish the objects for which they were enacted.

See Liberty Warehouse Co. v. Burley T. G. Co-Op. Assn., 276 U. S., 71, 48 S. Ct., 291, 72 L. Ed., 473, and the cases cited and referred to in the footnotes; Texas Farm Bureau Cotton Association v. Stovall, 113 Texas, 273, 253 S. W., 1101; Lennox v. Texas Cotton Co-Op. Assn., 55 S. W. (2d) 543.

■ The construction of this contract may be based upon one cardinal rule, viz: What was the intention of the parties thereto when construed in connection with the history of the class of legislation and the purposes sought to be attained? What is the nature of the title by which an association holds property which it is marketing for its members? To what extent does it act in its own corporate right and to what extent in a fiduciary capacity? The intention of the parties to a contract will control. If necessary, to give effect to the intention of the parties courts will brush aside mere form and examine the instrument as a whole, in the light of the nature and circumstances of the transaction, with a view of ascertaining the true intention of the parties expressed in the instrument. Co-operative marketing associations and their operations have brought their share of new problems. They have taken their place in the business world, and dealers, manufacturers, and business men in general are buying their commodities. The law and the contracts executed thereunder authorize the association to market and sell the agricultural products of its members. The association is made the agent of its members to handle their products; it is given the authority to borrow money on the products and to pledge same as security for any of its obligations. It also has the right to distribute the money so borrowed as advances equitably among the breeders in proportion to their delivery to the association, or may use any part thereof in its business operations. The title of the commodities is placed in the association to carry out these purposes. The authority conferred upon the association is necessary for it to operate and function successfully. It has no assets except the commodities delivered to it by the members of the association. It is a non-stock and non-profit concern and it must depend solely for its existence upon the contracts made with its members. To accomplish this end, the legislature has announced that it must handle only the products of its members, and will not countenance a divided service by permitting it to handle the products of non-members.

The aid of the great financial institutions of the country is essential to the success of these associations. The association must have financial assistance before it can function, and

the agent must have power to pool and sell the commodities it offers for sale or pledge same as security. For these purposes there is no limitation as to the authority conferred upon the association. The farmers as a group form the association, and appoint it to act as their selling agent. They turn over to the association their commodities to be pooled and sold on the market to the best advantages. However, the officers of the association have the controlling decision as to when and how the sale shall be made. This permits the association to place the commodities in its hands for sale when the conditions are favorable and prevents a dumping on the market of commodities for which there is no demand.

■ By the terms of the contract the grower has surrendered control over the sale of his product and thereby to this extent has divested himself of an important element of ownership. The contract upon this point is clothed in the terminology of a sale. The relation of consignor and factor has been abandoned. The logical and practical object of the members, as expressed in the contract, is to clothe the transaction in the language of a sale for the purpose of permitting the exercise of all powers named in the contract rather than a consignment in order to enable the association to enter bona fide transactions free from the embarrassment arising out of an incomplete title. The agreement provides that the breeder agrees to sell and the association to buy certain designated cottonseed to be grown or acquired by the breeder during a certain time; that the association will use its best efforts to re-sell the products on such terms and conditions and by such ways and at such times as its officers may deem advisable and will pay over to the breeder the net amount received as the purchase price of the commodities, less freight, insurance and interest, and after deducting the cost of maintaining and operating the association, the costs incident to the handling, storing and marketing thereof including a reduction of not to exceed 10% of its gross re-sale price for reserves which may be used by this association for any purpose. However, such reserves shall remain the property of the breeder and shall be refunded at book value at such time as the association shall determine. Delivery of the cottonseed completes the sale.

The members of the association, in order to promote their welfare, delivered their seed to the association. They constituted the association their agents with broad and exclusive powers to handle and sell their commodity. This was necessary to accomplish the very purposes for which it was created. It

being the clear intention of the members to create a true co-operative marketing association, under the powers enumerated by law and by the contracts, to perform certain services exclusively for its members, and to hold in the face of this intention that the delivery of the seed to the association was an absolute sale would destroy it as a co-operative marketing association. The members have conferred on this association, as their selling agent, such title to the cottonseed with plenary powers to handle and dispose of same, but the association handles the proceeds thereof for the benefit of itself and its members. See Johnson v. Staple Cotton Co-Op. Assn., 142 Miss., 312, 107 So., 2; Tobacco Growers Co-Op. Assn. v. Jones, 185 N. C., 265, 117 S. E., 174, 33 A. L. R., 231; Haarparinne v. Butter Hill Fruit Growers Assn., 122 Me., 138, 119 Atl., 116; Phez Co. v. Salem Fruit Union, 103 Or., 514, 201 Pac., 222, 25 A. L. R., 1090; Columbia Law Review for February, 1923, p. 91.

■ Because the seed delivered by Aldridge to the association was placed in a separate warehouse, was insured in favor of the association and the amount of insurance collected therefor on account of the seed being destroyed by fire, does not change the relations between Aldridge and the association. Other members placed their seed in separate warehouses just as Aldridge did. A warehouse receipt had been issued for the cottonseed delivered by Aldridge in the name of the association and the receipt sent to the office. Under the terms of the contract this was a sufficient delivery. The price for which the breeder receives for his seed is not determined until the products have been sold. To do away with any appearance of favoritism, the agreement provides that all products may be pooled with other commodities as in the discretion of the association it may deem advisable and that the aggregate proceeds of each pool shall be divided ratably among the breeders, less expenses incident to the handling thereof by the association. For the purposes above stated the title of the seed was placed in the association and they were put up as security for a loan of $370,128.80 and out of this amount $1.00 per bushel thereof was advanced to all of its members with one exception. Aldridge delivered to the association 11,916 bushels of seed and received as advancement out of the loan the sum of $11,916. All of the seed delivered by the members, including Aldridge, was handled, sold and accounted for in one general pool where all proceeds were averaged. Each member is charged with his advanced payment. The sales are made from the pool. Pro-

ceeds thereof, after expenses and after repayment of any sum borrowed to make advance payment, are distributed to the participants in the pool according to the number of bushels of seed contributed to the pool. In this way the returns of each member are based upon the average price realized on the seed of the grade and quality contributed by him.

On account of the financial depression the entire amount of seed delivered to the association was not sold. That left a large amount of seed in the hands of the association which had to be disposed of for commercial purposes. If the seed had not burned, they would have been considered as a part of the common pool. The Association borrowed money and pledged the seed as security for the debt. Aldridge received his pro rata share of the proceeds of that loan without any personal liability for the debt created by the association for his benefit. Insurance was obtained by the association on the seed delivered to it by its members and pledged as collateral for its obligations. This insurance was not carried in favor of or for the benefit of any individual member. The seed having been destroyed by fire the proceeds of the policy took the place of the seed among the assets held by the association for the benefit of its members. Any other rule would have been contrary to the intention of the members expressed in the contract and would have created favoritism. The association collected the insurance for the destruction of the seed by fire, and the proceeds thereof, together with the proceeds realized by it from the sales proceeds of the cottonseed belonging to the other members, were placed in the general or common pool for the benefit of the members of that pool, and will be considered in the final accounting of the assets belonging to that pool.

■■ The contract expressly provides that the association may borrow money on the seed delivered to it and shall distribute the money so borrowed as advances or partial payments equitably among the breeders in proportion to the deliveries to the association. If the seed is not sold, certainly the association could recover the excess advances to any one member. See Arkansas Cotton Growers Co-Op. Assn. v. Brown, 16 S. W. (2d) 177; Calif. Bean Growers Assn. v. Williams, 82 Calif. App., 434, 255 Pac., 751; Johnson v. Staple Cotton Co-Op. Assn., supra.

The judgments of the trial court and Court of Civil Appeals will be reversed and this cause remanded to the district court for another trial in accordance with this opinion.

The foregoing opinion is adopted as the opinion of the Su-

preme Court, and judgment will be entered in accordance therewith.

C. M. CURETON, Chief Justice.