FJELDAHL et al. v. HOMER CO–OP. ASS'N et al.
No. A–3935.

District Court of Alaska.   Third Division.   Anchorage.
June 20, 1946.

114

Davis & Renfrew, of Anchorage, for plaintiffs.

Almer J. Peterson and E. L. Arnell, both of Anchorage, for defendants.

DIMOND, District Judge.

In this action the plaintiffs, Ed Fjeldahl, Magnus Hollingstad and Martin Petersen, fishermen residing at Sel-

dovia, Alaska, seek judgment against the defendants, Homer Cooperative Association, hereinafter referred to as the Association, and Ralph Terranova, to foreclose liens, as claimed, upon certain property of each defendant, as well as personal judgment against the Association.

The plaintiffs, in separate causes of action stated in their complaint, allege that they severally furnished "certain halibut fish and aquatic animals" taken in the waters adjacent to Homer, Alaska, to the Association and that the same were resold by the Association to Terranova. Below are quoted paragraphs IV, V and VI of plaintiffs' first cause of action on the claim of Fjeldahl, the other plaintiffs pleading in like manner:

"IV. That immediately prior to the opening of the 1945 fishing season the plaintiff, Ed Fjeldahl, was employed under oral contract by the Homer Cooperative Association to furnish material, services, and labor during the 1945 fishing season in connection with catching and delivering certain fish and aquatic animals and in contributing to the preparation of fish and aquatic animals for food, fish meal, fertilizer, oil, or other article of commerce.

"V. That under the terms of such contract of employment, the plaintiff, Ed Fjeldahl, caught certain halibut fish and aquatic animals in the waters adjacent to Homer, Territory of Alaska, and delivered such fish and aquatic animals to the defendant, Homer Cooperative Association, at Homer, Territory of Alaska, and that the plaintiff, Ed Fjeldahl, furnished the necessary material, consisting of a boat and other fishing equipment, and such necessary services and labor as were required for catching and delivering such fish and aquatic animals to the defendant, Homer Cooperative Association.

"VI. That, as plaintiff is informed and believes and so alleges the fact to be, such fish and aquatic animals furnished by the plaintiff, Ed Fjeldahl, to the defendant, Homer Cooperative Association, were prepared and processed for shipment by the defendant, Homer Cooperative

Association, and were, within the time allowed this plaintiff for filing his claim of lien upon said fish and aquatic animals as hereinafter set forth, sold by such Association to the defendant, Ralph Terranova, for resale elsewhere."

The liens are claimed on property reputed to be owned by the Association consisting of cold storage warehouses, dock houses, docks, wharves, buildings, houses, machinery and equipment and all other property located at Homer, Alaska, used by the Association in the preparation and processing of fish and aquatic animals for food, fish meal, fertilizer, oil or other articles of commerce, as well as approximately 10,000 pounds of halibut reputedly owned by defendant Terranova, stored in the cold storage warehouse of the Alaska Railroad at Anchorage, Alaska. The plaintiff Fjeldahl claims that there is due him from the Association the sum of $2,222.48. The plaintiff Hollingstad claims $1,-722.47. The plaintiff Petersen claims $2,102.32.

Terranova appeared, but afterward failed to file an answer to the plaintiffs' complaint and was adjudged in default. The Association has filed a separate answer, counter claim and cross-complaint, claiming that it acted only as an agent of plaintiffs and others for sale to Terranova of the fish caught and furnished by plaintiffs, and is in no manner responsible for the payment of the purchase price of the fish as agreed to by Terranova. The Association also claims that it has paid over to the plaintiffs more money than it received from Terranova for the fish supplied by the plaintiffs, and, therefore, on account of such over-payment, the Association asks for judgment against Fjeldahl in the sum of $278, against Hollingstad in the sum of $180.03, and against Petersen in the sum of $300.52. The plaintiffs by reply have denied the material allegations of the Association's answer inconsistent with the allegations of the complaint.

The suit is brought under an act of the Alaska Territorial Legislature, embraced in Chapter 113 of the Session Laws of Alaska, 1933, and appearing as Section 2051 et

seq., Compiled Laws of Alaska, 1933. Sec. 2051 reads as follows:

"Any person who contributes to the preparation of fish or aquatic animals, for food, fish meal, fertilizer, oil or other article of commerce, by furnishing material and labor, or either, therefor, shall have a lien upon the product or output of the cannery, saltery or other plant or establishment, for which such material or labor was furnished, as well as upon such plant or establishment itself, including the houses, wharves, machinery and equipment thereunto belonging, for the value of such labor and material; this provision shall not be construed as to give a lien to any officer of a corporation or of an association for labor or material furnished by him to such corporation or association; nor shall it be construed to give a lien to a superintendent, manager, foreman, contractor or subcontractor in charge of any cannery, saltery or other plant or establishment for labor or material which he shall have furnished to such plant or establishment; nor shall it be construed to give a lien to the owner or lessor of a plant or the equipment thereof for the use or rental of the same."

Involved in the case are problems of law which, while deserving of thought and study, are not beyond solution to reasonable certainty, and matters of fact so vague and indefinite, when seen through the memory-twilight of the parties concerned, as to challenge, if not deny, any sureness of vision or of judgment.

Those affected by the outcome of the action, and who appeared as witnesses at the trial, are apparently honest, industrious and truthful, good men and good citizens. This is said despite sharp conflicts in testimony which are always to be expected when the several participants to conversations held more than a year ago, testify from recollection only concerning those conversations. Nothing has been shown to indicate that any of the parties or witnesses possesses more than modest means. The losers in the action, no matter what the outcome, are likely to be men who, in

this world's goods, are not accounted as wealthy, thus accentuating, if possible, the moral demand for a just decision.

The members of the Association, from 90 to 100, are largely farmers; a few are fishermen; and still other members are neither farmers nor fishermen. Most of the members reside at or near Homer, Alaska, which is a farm settlement and port on the north shore of Kachemak Bay, about 16 miles distant from Seldovia, on the southerly side of the Bay. The Association was organized in July, 1944. At first its operations were distinctly helpful and reasonably profitable to its members, as well as beneficial to the public. In the early spring of 1945 the Board of Directors and Officers of the Association conceived that in addition to the sale of the farm produce of its members, the Association should likewise dispose of sea food of various types caught or produced by its members, and that additional membership should be solicited from among the fishermen residing at Homer and Seldovia to insure an adequate supply of fish.

Pursuant to this plan, in March, 1945, two members of the Association approached the plaintiffs, Fjeldahl and Hollingstad, at Seldovia, and suggested that the plaintiffs, by joining the Association, might advantageously market halibut to or through that corporation. The plaintiffs ultimately, but without any demonstrable enthusiasm, purchased one share each of the stock of the Association and thus became members.

The inclusion of the plaintiff Petersen was made under somewhat different circumstances. Although the initial conversations were almost the same in his case as they were with respect to the other two plaintiffs, the undisputed testimony showed the plaintiff Petersen had an extended discussion of the subject with a number, if not all, of the members of the Board of Directors of the Association at the time that plaintiff purchased a share of stock of the

Association. This conversation took place at a meeting held in Homer on April 22, 1945, when the proposal to take and market halibut was talked over at length. The persons present at that meeting who testified as witnesses at the trial of the cause, disagree as to what was said except the general subject of the conversation. The plaintiff Petersen and witness William Putnam agree in most material matters as to what was said, while witnesses Sam Pratt and Rex Elliott, the latter being secretary of the Association, gave quite a different account of the conversation.

Prior to April, 1945, the Association, principally through its manager, Sol Brososky, had negotiated with the defendant Terranova with respect to the marketing of sea products at Anchorage, to be supplied by the Association to Terranova. It was contemplated, of course, that the fish would be caught by members of the Association. The preliminary discussions contemplated that Terranova should furnish a bond for the faithful performance of his contract to pay for all fish sold him, but in the ultimate outcome no such bond was given.

In any event, on April 4, 1945 at Anchorage, Alaska, a contract which was called a "sales agreement" was entered into between the defendant Terranova, called "the purchaser," and the Association, called "the seller." Under this contract the purchaser Terranova agreed to purchase from the defendant Association, not only farm produce but also marine sea foods of various types including salmon, clams, crabs and halibut "at the f. o. b. price on dock set opposite each variety, as follows:

"(1) Salmon
        Silver ........17¢ per lb. dressed, head attached
        King .........20¢ per lb. dressed, head attached
        Red ..........17¢ per lb. dressed, head attached
"(2) Clams ............10¢ per lb. gross weight unshelled
"(3) Crab (Dungeness) .40¢ ea., minimum weight 1½ lb. cooked.
"(4) Halibut ..........Current wholesale marked price per lb.,
                    dressed and headless."

Terranova, in this contract, agreed to make payments to the Association through its manager or other authorized officer for all sea foods, farm products and produce delivered under the contract, on or before the 10th, 20th and 1st days of each month, payment to be made every ten days. Nothing in this contract explicitly or indirectly indicates that the Association was acting as an agent in the sale of the produce described therein, except for the statement that the Association was engaged "in the marketing of such commodities." But it appears likely that even if it was understood by all parties, including the persons who were then or thereafter members of the Association and who supplied halibut for sale to Terranova, that the Association was, in fact, acting as such agent, the contract would have been the same. The contract in and of itself does not define the real relations between the Association and its members with respect to the produce to be sold, including marine sea foods, which the Association, as seller, therein contracted to sell and deliver to Terranova as the purchaser. If the individual members of the Association actually remained the owners of the property covered by the contract until its delivery to Terranova, and the Association acted only as agent of its members, no inkling of the existence of any such arrangement may be gained from the reading of the contract itself.

The plaintiffs insist that it was the understanding and agreement between themselves and the Association that the Association actually purchased the fish and did not act as a mere agent for making sale to Terranova. As proof of their justification in that belief, they have testified to conversation with Sol Brososky in which the latter chidingly assured them that their "responsibility" ended when the fish were delivered by the plaintiffs to him as manager of the Association on the wharf at Homer, and as to payment for the fish Brososky said: "Leave it to me; that's my business."

■ The position of Sol Brososky is deserving of further consideration. He was the general manager of the Association during the entire spring and early summer of 1945, the period within which the plaintiffs joined the Association and furnished the halibut for the payment of which they now bring suit. It is apparent that Brososky was an enthusiastic extrovert who, in his optimistic and exalted vision, could discern only the coruscating and seductive brilliance of the sun shining on the summit of the gloriously refulgent Mountain of Success. The mere suggestion of caution or possible failure was evidently repugnant to him, and whenever any question arose concerning payment for the fish being supplied by the plaintiffs he promptly and almost reprovingly gave the necessary assurances. It appears that Mr. Brososky, such was the trust reposed in him by the Board of the Association, was at one time treasurer of the corporation, as well as its general manager. How long he continued in the office of treasurer is not disclosed in the testimony. In any event, it is plain that during the time when the claims in litigation here arose the management and control of the whole project was left by the members of the Board in Brososky's hands, so much so that the president, Kranich, as shown by the uncontradicted testimony of Fjeldahl and Hollingstad, was startled to learn later that the plaintiffs had not been paid for their fish, because Brososky had told Kranich that all the fishermen had "been paid in full and everybody satisfied" and "happy" and "well pleased." Any corporation which gives such power to its general manager, in the absence of any inhibitory law, is ordinarily bound by his actions. Perhaps it should be observed here that Mr. Brososky's certainty of success in the business was so genuine and sincere that, as indicated by the testimony of the witness Waterman, Brososky did not draw all the wages due him for his own services to the Association.

■ Brososky did not appear as a witness at the trial of the case. At first it was suggested that he was an in-

dispensable witness.   Later it was said that he was engaged in other employment at a place in Alaska several hundred miles distant and that he could not be spared from his current duty.   Still later defendant's counsel announced that he would not be a witness, and plaintiffs' counsel indicated an intention of calling him as a witness for the plaintiffs if he were available.   The materiality and importance of the testimony of Brososky is beyond any doubt or question. Since it is tolerably clear to the Court that he could have been produced as a witness if the Association had desired him to testify, the testimony of the plaintiffs as to the declarations of Brososky on the very point in issue must be taken as true to the best of the recollection of the witnesses.   In every jury trial the Court, by law, is required to give to the jury the instruction that "if the weaker and less satisfactory evidence is offered when it appears that stronger and more satisfactory evidence was within the power of the party, the evidence offered should be viewed with distrust."   Thus it is here.

While it is suggested by counsel for the Association, through inference at least, that the Association was not bound by Brososky's promises or declarations to the plaintiffs, that view is not tenable, unless the Court can hold by evidence, or presumption, or the mandates of "burden of proof" that the plaintiffs knew, or should have known, that they were to be paid for the halibut supplied only if Terranova should pay the Association.

During the months of May, June and July, 1945, the plaintiffs caught halibut in the waters of the ocean near Homer, Alaska, and delivered the halibut so caught to the Association at the latter's wharf at Homer.   It appears that Brososky, or some other person for him, helped to hoist the halibut out of the plaintiffs' boats and place the fish upon the wharf, where they were weighed and statement of the weight and price thereof was given to the person supplying the fish.   These statements were written by Brososky on printed forms, evidently in common use by the

Association at the wharf. A copy of the first one furnished to Fjeldahl containing both the printed matter on the statement, as well as that written in by Brososky, that is, Fjeldahl's name, the name of his boat, the species of fish, the weight thereof, the rate, and the total amount to be paid for the fish, appears below:

Expense Bill

Homer Civic Dock   No. 2726

Homer, Alaska

....Ed Fjeldahl............

........................ Date.....May 11..45........

For wharfage charges and advanced charges on
 articles described below:

From ...Mystic............ To ......................

| No. of Pkgs. | Commodities | Weight or Measurement | Rate | Charges |
|---|---|---|---|---|
| ............ | ...Halibut........ | ..510 lb........ | 16.2.... | .32.62... |
| | | | | |
| | | | | |

Received in Good Order ...........................

All claims must be made within 5 days after Vessel's delivery of goods at landing, and be accompanied by this Expense Bill and original Shipping Receipt or Bill of Lading.

Loss and Damage Claims Must be Presented Within 24 Hours.

After the plaintiffs ceased to supply halibut to the Association, Brososky made out and signed and delivered to each of the plaintiffs a statement showing each of the deliveries of fish, the weight thereof, the amount due to the plaintiff thereon and the "credit" or the several amounts paid to each plaintiff from time to time, together with the balance due to each plaintiff. These statements are claimed by the plaintiffs to be accounts stated, and while of high evidentiary value as to the amount and price of the halibut supplied by the plaintiffs to the Association, they are far from being conclusive as to the nature of the relation of

the plaintiffs to the Association with respect to payment for such fish.

Thus we are brought forward to the nature of the actual contract between the parties. It is useless to lament the absence of anything in writing, but difficult to resist a feeling of regret when it seems certain that a written memorandum no longer than the Lord's Prayer would, in all likelihood, have eliminated the possibility of any litigation, either by fully sustaining the claims of the plaintiffs, or those of the Association, or because the plaintiffs would not have signed the writing and would not have supplied fish to the Association. In view of the testimony, it is here impossible to apply the "familiar rubric, still reechoing in judicial dicta that a contract requires the meeting of the minds of the parties." 1 Williston on Contracts, Sec. 22, p. 42.

"Moreover, it is of no consequence for another and deeper reason: A contract has, strictly speaking, nothing to do with the personal, or individual, intent of the parties. A contract is an obligation attached by the mere force of law to certain acts of the parties, usually words, which ordinarily accompany and represent a known intent. If, however, it were proved by twenty bishops that either party, when he used the words, intended something else than the usual meaning which the law imposes upon them, he would still be held, unless there were some mutual mistake, or something else of the sort. Of course, if it appear by other words, or acts, of the parties, that they attribute a peculiar meaning to such words as they use in the contract, that meaning will prevail, but only by virtue of the other words, and not because of their unexpressed intent." Hotchkiss v. National City Bank, D. C., 200 F. 287, 293 (Op. by L. Hand, J.).

A rule of interpretation must be found elsewhere. In Restatement of Contracts, Sec. 227, several conceivable standards of interpretation are set out. Williston says, Vol. 3, Sec. 603, p. 1732, that:

"That standard most applicable to a bilateral transaction would seem to be that of reasonable expectation, No. 5, that is, the sense in which the party using the words should reasonably have apprehended that they would be understood by the other party."

As set forth in the Restatement, the standard of reasonable expectation is stated as follows:

"5. A standard of reasonable expectation, which would attach to words or other manifestations of intention the meaning which the party employing them should reasonably have apprehended that they would convey to the other party."

■■ That standard should be applied here, and so applying it, we are led to the conviction that the Association, which through its officers and agents made the proposal and initiated the program and sought out and endeavored to interest, and did interest, the plaintiffs in it, must be bound by the meaning which the Association's officers and agents should reasonably have apprehended that the words they used would convey to the plaintiffs. The plan was that of the Association, not of the plaintiffs. The "offer" was made by the Association and, as they understood the "offer," it was accepted by the plaintiffs. Considering the undisputed testimony of the plaintiffs and of the witness Putnam, who corroborated them in material respects, as to the large and glowing promises and assurances given by Brososky to the plaintiffs, the conclusion is all but inescapable that the Association's officers and agents should have reasonably expected that its words, together with its written contract with Terranova, were bound to convey to the plaintiffs the understanding that the Association was to be responsible in any event for payment of the halibut furnished by the plaintiffs to the Association, and by the Association sold and delivered to Terranova.

In the entire case it is necessary to consider the business experience of each of the parties. Undoubtedly the plaintiffs have had ample experience in the business of taking

and catching and selling fish. But that is all. There is no evidence that any of them has engaged in business otherwise, or that any has ever before had dealings with the cooperative association, and so, although a person of a wider business experience and having general knowledge of cooperatives might well understand without being told that the Association ordinarily acted only as agent in the sale of the merchandise of its members, no such knowledge can be imputed to any of the plaintiffs in this action.

■ The suggestion is made that the Association, under the law, and by its very nature, is not authorized or eligible to purchase outright the produce or supplies furnished it by its members for sale, and that thus by universal and well known custom, and by law, the Association acted, and must have acted, and was limited to act, only as an agent or factor, and, in the extreme, possibly as a factor del credere. While it seems probable that in most cases, all over the nation, perhaps in 99% of them, cooperative associations engaged in the sale of farm or other produce of its members do act as agents or factors, and do not purchase outright the property later to be resold, the law itself in this Territory does not forbid purchase of the property of its members by such associations for resale at some subsequent time.

Nothing in the basic law, Ch. 15 of the Session Laws of Alaska, 1935, which adheres to the usual form of such statutes, forbids such a cooperative association to purchase on its own account. The powers of each association are set forth in Sec. 5 of the act, which reads as follows:

"Powers. Each association incorporated under this Act shall have the following powers:

"(a) To engage in any activity in connection with the marketing, selling, preserving, harvesting, drying, processing, manufacturing, canning, packing, grading, storing, handling, or utilization of any agricultural or aquatic products produced or delivered to it by its members; or the manufacturing or marketing of the by-products thereof;

or any activity in connection with the purchase, hiring, or use by its members of supplies, machinery, or equipment; or in the financing of any such activities; or in any one or more of the activities specified in this section. No association, however, shall handle the agricultural or aquatic products of any nonmember.

"(b) To borrow money without limitation as to amount of corporate indebtedness or liability; and to make advances to members.

"(c) To act as the agent or representative of any member or members in any of the above-mentioned activities.

"(d) To purchase or otherwise acquire; and to hold, own and exercise all rights of ownership in and to sell, transfer or pledge, or guarantee the payment of dividends or interest on, or the retirement or redemption of, shares of the capital stock or bonds of any corporation or association engaged in any related activity or in the warehousing or handling or marketing of any of the products handled by the association.

"(e) To establish reserves and to invest the funds thereof in bonds or in such other property as may be provided in the by-laws.

"(f) To buy, hold, and exercise all privileges of ownership over such real or personal property as may be necessary or convenient for the conduct and operation of any of the business of the association or incidental thereto.

"(g) To do each and everything necessary, suitable, or proper for the accomplishment of any one of the purposes or the attainment of any one or more of the subjects herein enumerated, or conducive to or expedient for the interest or benefit of the association; and to contract accordingly; and in addition to exercise and possess all powers, rights, and privileges necessary or incidental to the purposes for which the association is organized or to the activities in which it is engaged, and, in addition, any other rights, powers, and privileges granted by the laws of this Territory to ordinary corporations, except such as are inconsistent

with the express provisions of this Act; and to do any such thing anywhere."

The Articles of Incorporation of the Association are based upon the law and provide that the objects and purposes for which the Association is formed are:

"(A) To engage in any activity involving or relating to the marketing or selling of agricultural products, or the harvesting, preserving, drying, processing, canning, packing, grading, storing, handling, shipping or utilization thereof, or manufacturing or making of by-products thereof or therefrom, or in connection with manufacturing, selling or supplying to the members of machinery, equipment, goods or supplies, or causing to be financed or in financing or otherwise providing for the accomplishment of any or all of said activities, and to act as agent in doing any of the foregoing things, or to appoint agents to do so for it and/or its members and patrons; providing that the association shall not deal in the agricultural products of non-members in any amount greater in value than that handled by it for its members.

"(B) To engage in any activity involving or relating to the marketing or selling of aquatic products, or the harvesting, preserving, drying, processing, canning, packing, grading, storing, handling, shipping or utilization thereof, or manufacturing or making of by-products thereof, or therefrom, or in connection with manufacturing, selling or supplying to the members of machinery, equipment, goods or supplies, or causing to be financed or in financing or otherwise providing for the accomplishment of any or all of said activities, and to act as agent in doing any of the foregoing things, or to appoint agents to do so for it and/or its members and patrons; providing that the association shall not deal in the acquatic products of non-members in any amount greater in value than that handled by it for its members."

The by-laws of the Association, which were introduced in evidence at the trial of the cause, contain no restriction

which would prevent the Association from purchasing for its own account and outright any of the produce supplied by its members. We are, therefore, forced to resolve the issue as to what contract must be spelled out of the words and actions of the parties.

As indicated above, in making that determination, the texts of law writers and the adjudicated cases are only moderately helpful, and none is controlling nor even highly convincing. In most of the cases the contracts themselves expressly provide that the individual cooperative association shall act as the agent of its members—the customary thing—and, therefore there is no room for dispute as to the relation of the parties. Several examples are given.

Under law similar to ours in Colorado, the contract between the member and the association provided that the association should act as sole agent for the marketing of produce. Mountain States Beet Growers' Marketing Ass'n v. Monroe, 1928, 84 Colo. 300, 269 P. 886, page 887, 1st Col., followed in Industrial Commission v. United Fruit Growers Ass'n, 1940, 106 Colo. 223, 103 P.2d 15.

In a California case the contract provided that the cooperative association should act as "agent" of the members and the association was held not liable for delay in marketing in the absence of showing that the association had unreasonably exercised discretion. California Bean Growers Ass'n v. Rindge Land & Navigation Co., 1926, 199 Cal. 168, 248 P. 658, 47 A.L.R. 904.

In construing a tax statute of Kansas, the cooperative association was called an agent of its members and not a merchant within the contemplation of law. Kansas Wheat Growers' Ass'n v. Board of Com'rs of Sedgwick County et al., 1925, 119 Kan. 877, 241 P. 466.

In the State of Mississippi in an action by a member of the association, on an insurance policy, the association was held as an agent under the law and the contract, the Court saying:

"An agent or a factor or a trustee has a right to insure the property of his principal, and if he does insure it the principal is entitled to recover." Johnson v. Staple Cotton Co-op. Ass'n, 1926, 142 Miss. 312, 107 So. 2 page 5, 1st col.

In a case decided by the Supreme Court of Texas in 1933, it was held that the association had the right to recover an advance to one of its members. From the opinion in this case, in which the member of the association is referred to as the "Breeder," the following is quoted, as a part of the contract:

"The Association buys and the Breeder sells and agrees to deliver to the Association all the Texas State Certified Cottonseed now on hand or produced by or for him. * * *

"All Texas State Certified Cottonseed shall be delivered to the Association as soon as practicable after the gathering thereof at such warehouse as may be approved and designated by the Association. * * *

"The Association shall resell, on such terms and conditions and by such ways as the Board of Directors of the Association may deem advisable, all * * * Cottonseed delivered to it by the Breeder and by other Breeders * * * at the best prices obtainable * * * and will pay over to the Breeder the net amount received therefrom, less freight, insurance and interest and after deducting the cost of maintaining and operating the Association. * * *" Texas Certified Cottonseed Breeders' Ass'n v. Aldridge, 122 Tex. 464, 61 S.W.2d 79, 80.

In this case it is obvious enough that the association acted as the agent and it did not buy outright on its own account.

The Supreme Court of California in the case of Irvine Co. v. McColgan, 1945, 26 Cal.2d 160, 157 P.2d 847, 851, in a case involving the collection of franchise tax of the State of California, used the following language concerning the relation between the cooperative association and its members:

"We are of the opinion that cooperative marketing associations are factors, or   *   *   *   closely akin thereto. *   *   * "

It was held that defendant was an independent operator in the nature of a factor, and not the mere agent of the members.   Three of the justices joined in the opinion. One concurred in the judgment saying:

"I do not believe it is material whether the cooperative marketing association was the agent of plaintiff or was an independent contractor."

A vigorous dissent was joined in by two of the justices who urged that "The cooperative is the agent of its members."

In Wisconsin in a case where one cooperative association was dealing with another cooperative association the Court found that the transaction was one of outright purchase and sale, and that the purchaser was liable and did not merely act as an agent.   Neith Cooperative Dairy Products Ass'n v. National Cheese Producers Federation, 1934, 217, Wis. 202, 257 N.W. 624, 98 A.L.R. 1403.

Similarly in another Texas case, that of Texas Farm Bureau Cotton Ass'n v. Stovall, 1923, 113 Tex. 273, 253 S.W. 1101, 1107, a contract between the association and a member was held to constitute a contract of purchase and sale, and that the association was not merely the agent of the member, despite the fact that it was agreed the members should be paid out of the proceeds of a pool.   No question arose as to the price to be paid, and the suit was brought to enjoin the member from selling his cotton to parties other than the association.   In its opinion the Court said:

"It is sufficient to say that, in view of the statute, and the express language of the agreement declaring the instrument a contract of sale and purchase, we must regard it as such a contract in so far as the parties here are concerned."

The Supreme Judicial Court of Maine in 1922 in the case of Haarparinne v. Butter Hill Fruit Growers' Ass'n, 122 Me. 138, 119 A. 116, where, as in the instant case, there was no written contract between the parties, held that under the certificate of incorporation the cooperative association was an agent of the member, and that the transaction therein questioned was not a sale to the corporation by the member. In this case a quantity of apples produced by the member was packed under the supervision of a representative of the association and left in care of the member. The apples froze and the member sued for their value. In the lower Court the member recovered but the decision of the lower Court was reversed by the Supreme Judicial Court of the State.

Counsel for the plaintiffs has also invited attention to Restatement of the Law of Agencies, Sec. 424, but that text, however valuable, is not in all respects applicable here because the question for decision in the instant case is whether the relation of principal and agent, or some other relation, existed between the parties.

A circumstance tending to support the contention of the defendant, and militating to an equal degree against the plaintiffs, is that the Association, to the knowledge of all of the plaintiffs, was to charge and did charge only 10% for its services in connection with the sale or marketing of the halibut supplied by the plaintiffs. All concerned understood that to be the fact, and it was the fact. The receipts issued by the co-op to the plaintiffs specified the prices which the plaintiffs were to receive for the halibut, as 10% under the market price. And so it may be validly argued that this limitation of compensation for the Association was adequate warning to the plaintiffs that the Association did not purchase the halibut on its own account but only acted as the agent of the plaintiffs and other fishermen in making sale of the product. The argument is far from being conclusive because it must also be considered that even though the Association was buying the fish on its own account, it

might conceivably, even probably, agree to limit its profit to 10% in order to persuade the plaintiffs to sell their fish to the Association.

Another circumstance operating against the plaintiffs and in favor of the Association lies in the fact that the plaintiffs made inquiry of Sol Brososky, possibly of others, whether or not any bond had been furnished or insurance given that the defendant Terranova would pay for the fish sold to him. This inquiry might indicate that the plaintiffs knew, or understood, or at least suspected, that they were not to be paid unless Terranova paid the Association and, therefore, that the Association was really acting as the agent for the plaintiffs and other fishermen. Against this it may be urged with equal force that the plaintiffs, by their own observation, could see that the Association was without any considerable means or property, and that even if the Association were buying for itself, unless Terranova paid the Association, the fishermen were likely to remain unpaid because the Association had no money and no means out of which to pay for the fish. Therefore, even though it was understood between the parties, or was understood by the fishermen, that they were selling to the Association and not to Terranova, and that the Association was acting for itself and not as agent, they still naturally might have made the inquiry about a bond to guarantee the payment by Terranova for the fish he bought.

It may well be asked whether the claims of plaintiffs, as shown by the proof, come within the law relative to the liens of cannery workmen and fishermen. The relevant portion of the statute is quoted above. It is plain that the plaintiffs supplied or "furnished" the fish for which they claim their liens. The Act says that the person who furnishes the fish "shall have a lien upon the product or output of the cannery, saltery or other plant or establishment." It appears from the evidence that the only "plant or establishment" which the Association had or used in connection with the transaction here in question consisted of

a wharf structure at Homer, Alaska. The cold storage plant of the Association, so far as shown by the evidence, was not at any time used in connection with any of the fish furnished by the plaintiffs during 1945. Is it correct to say that the Association's operation resulted in any "product or output?" The fish were brought to the Association's wharf by the plaintiffs and were discharged upon the wharf. While the testimony on the point is vague, it may indicate that the Association actually placed the fish in containers supplied by Terranova. But that appears to have been all. Terranova accepted the fish on the wharf. Most of them were hauled by Terranova to the airport and from that point shipped to Anchorage by air. A portion, as shown by the evidence, were placed on the plaintiff Petersen's boat, and by him hauled to Anchorage. The labor done in boxing the halibut by anyone in the employ of the Association must have been slight indeed.

■■ It is difficult to say where the line should be drawn. If the Association had packed or processed the halibut then the application of the law would be indisputable. Those who wrote the law were careful not only to cover canneries and salteries but also used the all-embracing term "all other plants or establishments," thus evidently expressing the intention of the law-making body to embrace not only canneries and salteries but every other type of structure used in any manner or to any extent in the preparation of fish or aquatic animals for food or other article of commerce. In this case the "product or output" of the Association with respect to the halibut was simply raw halibut in substantially the same condition as when received. And yet it was, in a sense, a "product or output" and the wharf was an "establishment" used in the preparation of fish for food. In view of the remedial nature of the lien law it would be unbecoming to split hairs over its practical application. I find that the law applies.

■■ The Association claims that it is entitled to judgment upon the face of plaintiffs' complaint, in view of the

evidence. As indicated above, the plaintiffs alleged in their complaint that they were "employed" under oral contract by the Association, and that under the terms of such "contract of employment" they furnished the fish for the price of which they now demand judgment. Counsel for the Association say that the proof shows no suggestion that the plaintiffs were "employed" by the Association or that there was any such thing between them as a "contract of employment."

While the words "employ" and "employed" and "employment" ordinarily contemplate the relation of master and servant, other meanings may be assigned to them. In Webster we find that employ may mean "To make use of, as an instrument, means or material; * * * to make use of the services of * * *." In the case of the United States v. Morris, 14 Pet. 464, at page 475, 39 U.S. 464, at page 475, 10 L.Ed. 543, we find the following:

"To be employed in anything means not only the act of doing it, but also to be engaged to do it; to be under contract or orders to do it."

While that case had to do with the question as to whether or not a vessel was "employed" in the slave trade, the language used by Chief Justice Taney aptly illustrates the breadth and scope of the definition of the word "employed."

"Employment" means act of employing, state of being employed, that which engages or occupies, that which consumes time or attention, office or post of business, service, or occupation. Davis v. Lincoln County, 1928, 117 Neb. 148, 219 N.W. 899, 900. While perhaps other words than "employed" or "employment" could have been more aptly used in the pleadings in this case, the use of those words can not in any manner have deceived or misled the Association. Moreover, in the lien law we find the following:

"Sec. 2085. No mistake in formality or lack of statement, either in the lien notice or the pleadings, shall be ground for dismissal or unnecessary delay in the action to foreclose a lien. * * * "

"Sec. 2093. The intent of this chapter is hereby declared to be remedial and its provisions shall be liberally construed.

The complaint is sufficient.

Several of the features of the case, while not of large consequence, deserve reference. Testimony was offered, without objection, that witness Waterman, as the Association's representative, made an offer to one or more of the plaintiffs for compromise of the plaintiffs' claims. Such an offer is of no consequence and the testimony of it is not competent for admission in evidence. Sec. 4273, C. L.A.1933, provides as follows:

"An offer of compromise is not an admission that anything is due and no evidence thereof shall be permitted."

At one stage of the trial it was suggested that money received by the Association from Terranova in payment of the fish sold Terranova—fish furnished by the plaintiffs—had been diverted by the Association to other uses. The proof shows beyond any question that the Association paid out to the plaintiffs and other persons who supplied fish for sale to Terranova a total amount greater than that paid by Terranova to the Association for the fish so sold him. The testimony given at the trial that one or more payments made by Terranova for fish sold him by the Association, had been used for purposes other than the payment to the fishermen of the purchase price of their fish is, in view of the final event, totally irrelevant. The Association did not enrich itself at the expense of the fishermen. Quite otherwise.

The Association urges that in any event the plaintiffs' claims must be reduced by 19.3% on account of the spoilage of fish, this being an average of the asserted spoilage of all marine sea food products supplied to Terranova by the Association during 1945. Such claim of spoilage is unsupported by sufficient evidence. It is based upon the records of the Association showing that considerably more

fish was receipted for by the Association than was invoiced out to Terranova. The testimony is conclusive that the plaintiffs were in no manner at fault. There is no dispute as to the good quality of all the fish supplied by the plaintiffs to the Association. Indeed, it is at least tolerably clear that any spoilage was the fault of Terranova, and probably not the fault of the Association, and certainly not the fault of plaintiffs. To pass this loss along to the plaintiffs would be unjust.

The plaintiffs are entitled to recover. Careful consideration of all of the evidence concerning the claim of the plaintiff Fjeldahl indicates that the balance due him is $1,983.27, and judgment may be given for him in that amount. Judgment may be given for the other plaintiffs in the several amounts claimed in the complaint. Plaintiffs are also entitled to interest on their several claims at 6% per annum from the first day of August, 1945, together with their disbursements for filing and recording their several lien claims in the amounts stated in the complaint. In addition thereto an attorney's fee of $250 for each of plaintiffs will be allowed, making total attorney's fee for plaintiffs $750. Findings and decree may be prepared accordingly.