

# The Attorney General of Texas

**JIM MATTOX**
Attorney General

Supreme Court Building
P. O. Box 12548
Austin, TX. 78711- 2548
512/475-2501
Telex 910/874-1367
Telecopier 512/475-0266

714 Jackson, Suite 700
Dallas, TX. 75202-4506
214/742-8944

4824 Alberta Ave., Suite 160
El Paso, TX. 79905-2793
915/533-3484

1001 Texas, Suite 700
Houston, TX. 77002-3111
713/223-5886

806 Broadway, Suite 312
Lubbock, TX. 79401-3479
806/747-5238

4309 N. Tenth, Suite B
McAllen, TX. 78501-1685
512/682-4547

200 Main Plaza, Suite 400
San Antonio, TX. 78205-2797
512/225-4191

An Equal Opportunity/
Affirmative Action Employer

April 9, 1985

Arthur G. Hansen, Ph.D.
Chancellor
Texas A & M University System
College Station, Texas    77843

Opinion No. JM-305

Re: Whether the sale of "gin trash" by a gin is exempt under section 141.002(c)(4) of the Agriculture Code

Dear Dr. Hansen:

You ask us the following two questions:

> Can a cotton gin be considered a representative or agent of the farmer in disposal of the cotton plant by-product 'gin trash' under the circumstances outlined and thus be exempt from the economic provisions of the statute under section 141.002(c)(4)? Does it make any difference if the gin is a cooperative of farmers?

We conclude that the answer to your first question will depend upon the facts in each instance. If title to the produce passes from the farmer to the ginner, the subsection (c)(4) exemption from the code's registration, labeling and inspection requirements for commercial agricultural feed, does not follow the produce in a subsequent sale. If, on the other hand, title does not pass, the subsection (c)(4) exemption remains operable. We answer your second question in the affirmative.

Chapter 141 of the Agriculture Code governs the registration, labeling, and inspection of commercial agricultural feed. Section 141.002(c) restricts the definition of "commercial feed" for purposes of this chapter:

> The following are not commercial feeds subject to this chapter:
>
> (1)  unground hay;
>
> (2)  whole grain or whole seed not containing toxins or chemical adulterants;
>
> (3)  unadulterated cottonseed, peanut, or rice hulls;

(4) <u>a feed product produced and sold by a farmer</u>;

(5) an individual mineral substance not mixed with another material; or

(6) a material furnished by a purchaser for use in a customer-formula feed that was produced by the purchaser or acquired by the purchaser from a source other than the person whose services are engaged in the milling, mixing, or processing of a customer-formula feed. (Emphasis added).

Under the following submission of facts, you essentially wish to know under what circumstances the sale of "gin trash" can be held to be the sale of "a feed product produced and sold by a farmer."

Farmers produce the cotton plant, harvest it and deliver the harvested mixture to a cotton gin which, for a charge or fee, performs a processing service. The cotton mixture is divided into three basic fractions during the ginning process: lint, cottonseed, and gin trash.

The lint, which is formed into bales, is carefully identified such that each farmer is paid exactly according to the amount generated from his cotton and the grade quality of same. The ginner may either buy the cotton bales directly from the farmer on behalf of a third party, act as broker for the farmer, or merely transfer the bales to a warehouse for storage pending later sale. The ginner charges a fee for the transport to warehouse. Upon warehousing, the farmer is issued negotiable receipts for his cotton.

While the quantity of cottonseed generated from a particular lot of cotton is recorded, the seed from one lot are co-mingled in bulk with that of other lots and marketed as such by the gin. The proceeds from sale of seed extracted from a particular lot of cotton are prorated directly back to the gin service charges made to a farmer.

Specific records of the quantity of gin trash from a particular lot of cotton are not maintained. While the farmer has the option of receiving the gin trash from his lot of cotton, the impracticality of handling the gin trash most frequently results in its disposal by the gin. Any proceeds are applied against gin operating

costs and assist in keeping ginner service costs down to a minimum level. In many cases the cotton gin is a cooperative of farmers who jointly sell the gin trash to lower their costs of production.

Gin trash is primarily being sold to cattle feedlot operations to be used in finished rations for animals owned by their clientele.

Gin trash is a low density nutrient which is not utilized as a primary source of protein or fat in an animal ration as are most feed ingredients, but more for its 'bulk' or fiber content. In this respect gin trash is similar to unadulterated cottonseed hulls, peanut hulls and rice hulls, which are currently exempted from the act under section 141.002(c)(4).

The Ginners Association maintains that cotton gins act on behalf of the farmer, offering a service which is an extension of the harvesting process. It is further maintained that a farmer relinquishes ownership only when the disposition of lint, seed and gin trash is completed. The gin management acts for the grower in delivering gin trash to the point of its disposal, whether that disposal be to channels of the feed trade, in distribution across farmland, to a landfill, or otherwise. This disposal service is provided as part and parcel of the ginning service and in many cases may provide a return to the farmers in lower fees or charges.

The guiding principle of statutory construction is to ascertain legislative intent. Jessen Associates, Inc. v. Bullock, 531 S.W.2d 593 (Tex. 1975). From reading chapter 141 as a whole, it is clear that the legislature intended to set up a comprehensive scheme for the registration, labeling, and inspection of commercial agricultural feed. Section 141.002 sets forth certain specific exceptions to such requirements. The subsection (c)(4) exemption applies only to "a feed product produced and sold by a farmer." (Emphasis added). It is clear that the exemption is intended to reach a farmer only when he sells his product; he is then removed from the ambit of the registration, labeling, and inspection requirements. Once ownership of the gin trash passes from the farmer, however, the subsection (c)(4) exemption ceases to operate. It is unclear in your letter whether, and if so when, such title passes. The determination of your first question will finally depend on the facts involved in each instance. If title passes from the farmer to the ginner, then clearly the subsection (c)(4) exemption does not extend to the ginner when there is a subsequent sale by the ginner. The ginner would perforce be required to comply with the provisions of chapter 141. On the other

hand, if the ginner acts as a broker pursuant to some form of agency contract or accepts the cotton under some form of consignment agreement, the subsection (c)(4) exemption may still be operable.

You inform us that in many instances, a gin is operated as a cooperative of farmers. Therefore, you further ask whether the subsection (c)(4) exemption would extend to gin trash processed at a gin so operated. In section 51.004 of the Agriculture Code, a farmers' cooperative society is empowered to "act as an _agent_ for its members in selling the members' agricultural products. . . ." (Emphasis added). Agric. Code §51.004(a)(3). In such an instance, courts will look to the intention of the parties to the contract at issue and examine the contract as a whole rather than rely on the mere form of the contract. In _Texas Certified Cottonseed Breeders' Ass'n v. Aldridge_, 61 S.W.2d 79 (Tex. 1933), the Texas Supreme Court held that a marketing contract by which a cotton producer delivered cottonseed for resale to a co-operative marketing association did not effect an absolute sale, even though the agreement specifically provided that the association "buys" and the producer "sells and agrees to deliver" the produce. The court declared:

> The members of the association, in order to promote their welfare, delivered their seed to the association. They constituted the association their agent with broad and exclusive powers to handle and sell their commodity. This was necessary to accomplish the very purposes for which it was created. It being the clear intention of the members to create a true co-operative marketing association, under the powers enumerated by law and by the contracts, to perform certain services exclusively for its members, and to hold in the face of this intention that the delivery of the seed to the association was an absolute sale would destroy it as a co-operative marketing association. The members have conferred on this association, as their selling agent, such title to the cottonseed with plenary powers to handle and dispose of same, but the association handles the proceeds thereof for the benefit of itself and its members. (Emphasis added).

_Id._ at 83.

In another context, this office has previously determined that farm products held by a farm co-operative remain in the hands of the producer for purposes of article VIII, section 19 of the Texas Constitution which exempts from ad valorem taxation "[f]arm products . . . in the hands of the producer. . . ." Attorney General Opinions H-938 (1977); M-632 (1970); O-5404 (1943). The opinions concluded that farm products held by a co-operative remained in the

hands of the producer because the producers, in effect, constituted the co-operative as their agent. No absolute title to such products passed from the farmers to other parties. Analogously, we conclude that "gin trash" held by a gin operated as a farmers' co-operative may still receive the benefit of the subsection (c)(4) exemption because title to such product remains with the farmer with the co-operative acting merely as the producers' agent.

## S U M M A R Y

"Gin trash" in the control of a cotton ginner falls within the ambit of the section 141.002(c)(4) Agriculture Code exemption from registration, labeling, and inspection requirements for commercial agricultural feed only if title to such feed product has not passed from the farmer to another party. "Gin trash" in the control of a cotton ginner which is operated as a farmers' co-operative does fall within the exemption provisions.

Very truly yours

**JIM MATTOX**
Attorney General of Texas

TOM GREEN
First Assistant Attorney General

DAVID R. RICHARDS
Executive Assistant Attorney General

RICK GILPIN
Chairman, Opinion Committee

Prepared by Jim Moellinger
Assistant Attorney General

APPROVED:
OPINION COMMITTEE

Rick Gilpin, Chairman
Jon Bible
Colin Carl
Susan Garrison
Tony Guillory
Jim Moellinger
Jennifer Riggs
Nancy Sutton