[Civ. No. 1525. Fourth Appellate District.—October 24, 1934.]

COUNTY OF SAN BERNARDINO (a Body Corporate and Politic), Petitioner, v. INDUSTRIAL ACCIDENT COMMISSION and GEORGE W. BARNES, Respondents.

Stanley Mussell, District Attorney, and James L. King, Deputy District Attorney, for Petitioner.

Everett A. Corten and James G. Whyte for Respondents.

MARKS, J.—The Industrial Accident Commission gave George W. Barnes an award against the County of San Bernardino for injuries received by him on June 7 and 8, 1933, while working in Cucamonga Canyon in San Bernardino County.

The petitioner has sought to have this award annulled upon the grounds that Barnes was not an employee of the county within the meaning of that term as it is used in the Workmen's Compensation Act and as construed in the cases of *McBurney* v. *Industrial Acc. Com.*, 220 Cal. 124 [30 Pac. (2d) 414], *Rico* v. *Industrial Acc. Com.*, 137 Cal. App. 772 [30 Pac. (2d) 584], *Martin* v. *Industrial Acc. Com.*, 137 Cal. App. 771 [30 Pac. (2d) 527], and *County of Los Angeles* v. *Industrial Acc. Com.*, 140 Cal. App. 727 [35 Pac. 1035]. The parties are not only in sharp disagreement as to the law applicable to this case but also as to the facts proved. Therefore it will be necessary to detail the evidence before the commission in more than ordinary detail.

In 1931 the legislature passed a bill appropriating the sum of $400,000 to be used in controlling and conserving the flood waters of the Santa Ana River system by constructing upon the river and its tributaries in San Bernardino County "dams, protection barriers and such incidental works as shall be necessary for such purpose". (Stats. 1931, p. 1367.) The state engineer was given general powers of recommendation and approval of the works to be constructed. Under the provisions of the act the comptroller was authorized, on July 1, 1931, to draw a state warrant in favor of the county treasurer of San Bernardino County in the sum of $200,000, and a like warrant for a like sum on July 1, 1932. Both sums were deposited in the county treasury. The act provided "that no part or portion of said sum shall be expended unless and until provision shall have been made by the interested county or counties or by the interested district or districts, or by any city or any other interested agency affected or benefited by such work or having charge of the construction thereof affected or benefited by such work, for the payment annually, of one-half of the cost of such part of the work as shall be programmed for construction during the then current fiscal year. . . . The money hereby appropriated and made available and the money to be provided by the interested county or counties, or interested district or districts, shall be paid to and deposited with the county treasurer of San Bernardino County in a special fund to be known as 'Santa Ana river flood control fund', and

paid out only upon warrants duly authorized, drawn and signed by the agency having charge of the construction of such dams, protection barriers and incidental works.''

Ten water companies (presumably private corporations or associations) had organized the Cucamonga Protective Association to undertake some work connected with flood waters from the Cucamonga Canyon. They subscribed a fund to be used with an equal amount of state funds for paying the cost of the preliminary surveys, plans and specifications, expenses of superintendence, tools, materials and supplies to be used in the protection work in this canyon. Several of their engineers, including R. V. Ward, formerly engineer of the Cucamonga Water Company, did the preliminary work. As the act appropriating the money provided that the work should be in charge of a governmental agency, Ward was appointed superintendent of construction by the board of supervisors of San Bernardino County, at the request of the Cucamonga Protective Association. Except for a few days during the early part of his employment, his salary was paid out of the state funds and the money subscribed by the members of the association, and not out of the public funds of San Bernardino County.

There were three separate divisions of the Santa Ana River flood control fund on the books of the auditor of San Bernardino County. Each consisted of state money and equal amounts of money furnished by other agencies; one, the Cucamonga Protective Association; another, federal relief funds allotted to San Bernardino County by Mr. Branion, state administrator of relief, and administered by E. H. Grier, local administrator; and the third, other agencies not disclosed in the record, though San Bernardino County probably contributed some public money to this fund. The fund composed of equal amounts of state money and federal relief funds was used to pay the wages of those citizens of San Bernardino County on emergency unemployment relief, among whom was Barnes. Before any money was paid out of this fund the pay rolls of the laborers had to be approved by Grier. It further appears in the record, without contradiction, that ''all this emergency relief fund money had to be expended under the direction of Mr. Grier, the local director''. The actual demands for all wages were approved by the board of supervisors of San

Bernardino County and warrants issued by the county auditor on the fund in favor of the workmen. It affirmatively appears that these warrants were paid exclusively out of money furnished by the state and federal governments. No moneys of the County of San Bernardino derived from local sources were expended for this purpose.

During the earlier period of the depression there were a number of agencies in the city of Ontario, in San Bernardino County, devoting their separate energies to relief work. Later these were consolidated under one relief committee composed of volunteer members and headed by C. T. Holmer, city engineer of Ontario.

George W. Barnes was a needy resident of the city of Ontario and applied to this committee for aid. For about three months prior to his injury he was sent by the committee to work on the Cucamonga Canyon project for two days each week. He was given weekly work orders signed by Holmer, all on identical forms. The pertinent portion of these work orders was as follows:

> "Ontario Unemployment Relief
> "No Smoking
> "No. 631

"Instructions:

"By special arrangement this work will be handled entirely by the County of San Bernardino, and you will be employed by the county. You will receive your pay check at the Ontario Chamber of Commerce one week after completion of work.

"Rate of pay, $3.25 per day."

Holmer was not an employee of the County of San Bernardino, nor was it shown that he was its agent or acting for it in giving work orders. Neither was it shown that any responsible officer or representative of the County of San Bernardino had any knowledge of the contents of the order. It is evident, therefore, that the statement in the order that Barnes was to be employed by the County of San Bernardino was nothing more than the opinion or conclusion of Holmer and could not be binding on the county.

The evidence shows that the wages to be paid Barnes were not fixed by the County of San Bernardino; that the men paid by the state and relief funds were selected from

the welfare list by Holmer; that Ward had nothing to do with the selection of the individuals reporting for work; that he could refuse to give work to a man sent by Holmer only if it was apparent that the man was physically unfit and unable to perform a day's work; that he could not discharge these men unless they proved physically unfit or were deliberately not doing a reasonable day's work.

Respondents seek to distinguish the instant case from *McBurney* v. *Industrial Acc. Com., supra,* upon two grounds. They maintain that here the work being performed by Barnes was not "made work" as in the McBurney case, but a project for the benefit of a large number of the citizens of the county and planned long before the "relief" work was undertaken. They also urge that it is not shown that Barnes had ever been placed on the relief rolls of the county, as was true in the McBurney case, and therefore he was not a ward of the county and that the county owed him no duty of support.

■ It is true that the work being done by Barnes was on a project which had been planned for the benefit of the county and its citizens long before his injury. It also appears that "this entire project was a relief work, and entirely relief work, and it was relief work and a relief project for the purpose of employing persons who were unemployed". We do not believe that the time when a project was planned, or the benefits to the citizens of a county that may follow from its completion, can be determinative of the question of whether or not those employed upon it are engaged in doing "made work". This sort of employment is so common now that it is a matter of common knowledge that much of this work is done on well-established public projects. We often see large gangs of these men doing repair and maintenance work upon long established main highways. These highways have to be kept in repair and the work done on them is for the benefit of the public. McBurney was working at cleaning out a drainage ditch, not constructing a new one. A drainage ditch must be cleaned at intervals in order that it may properly function. The term "made work" should be construed as a "made job", given to indigents as a matter of relief rather than that the enterprise upon which the work was performed was made or planned solely for relief and without benefit

to the locality. The word "work" refers to the labor performed and not the project upon which it was performed. Under this definition the work assigned to Barnes was "made work" as it was given to him solely as a matter of relief.

■ It is true that Barnes had not been placed on the indigent rolls of San Bernardino County. Barnes testified that he was without means of support; that in sixty days he had received $120 from the welfare league in Ontario. The following appears in his testimony: "Q. And you were given County Relief of some kind? Wasn't that true? A. You mean work of some kind? Q. You were given work in lieu of other financial or material aid? A. Well, yes. The idea was to get work; bread. That was the reason." It therefore appears that he was an indigent person entitled to relief from San Bernardino County. (Stats. 1901, p. 636, as amended.) The mere fact that he had not been formally placed on the county indigent rolls should not change his status from a relief worker to that of an employee under the rule announced in the McBurney case. We have reached this conclusion after giving due consideration to the cases of *McLaughlin* v. *Antrim County Road Com.*, 266 Mich. 73 [253 N. W. 221], and *City of Waycross* v. *Hayes,* 48 Ga. App. 317 [172 S. E. 756], upon which respondents rely.

■ We have also reached the conclusion that Barnes was not in the employ of the County of San Bernardino at the time of his injury for the following reasons: There was no contract of hire between Barnes and the county. The county did not select him for the work. Ward (assuming but not holding that he was an employee of the county) was required to let Barnes work if he were physically competent. Ward could not discharge Barnes except for physical disability or refusal to do a reasonable day's work. Barnes was paid out of a trust fund furnished by the state and federal governments which could only be disbursed by the county for specific purposes. The federal funds could be used on approved relief projects only. No county funds were used to pay him. His wages were not fixed by the county. He could receive nothing for his work until the pay roll upon which his name appeared was approved by Grier who was not a county employee. That

his demand for wages was approved by the board of supervisors of San Bernardino County· and the warrant issued by the county auditor seems to have been a matter of convenient routine adopted in disbursing the trust funds.

The award of the Industrial Accident Commission is annulled.

Barnard, P. J., and Jennings, J., concurred.