[L.A. No. 31454. Dec. 17, 1981.]

COUNTY OF LOS ANGELES, Petitioner, v.
WORKERS' COMPENSATION APPEALS BOARD,
FRANCIS P. CONROY et al., Respondents.

COUNSEL

John H. Larson, County Counsel, Milton J. Litvin and Patrick A. Wu, Deputy County Counsel, for Petitioner.

Donald L. Clark, County Counsel (San Diego), and John R. Garcia, Deputy County Counsel, as Amici Curiae on behalf of Petitioner.

James J. Vonk, Richard A. Krimen, Arthur Hershenson, Frank Evans, Rose, Klein & Marias and Marvin N. Shapiro for Respondents.

Erica Hahn and Kenyon F. Dobberteen as Amici Curiae on behalf of Respondent Conroy.

OPINION

**BIRD, C. J.**—Is an indigent person who is required to work in order to receive general assistance benefits entitled to workers' compensation for an injury sustained on the job?

## I.

In 1971, petitioner, the County of Los Angeles (County), provided two types of general assistance benefits, commonly known as "welfare" and "workfare," to qualified indigent applicants. The County assigned applicants who were able to work to the workfare program. Those who were unable to work were assigned to the welfare program. Applicants of comparable need received the same level of benefits in each program. The only difference between the two programs was that the County required workfare recipients to earn their monthly benefit checks.

Under the workfare program, the County assigned recipients to a job with the County or with some other local governmental agency. The

County determined the number of hours the recipient was required to work each month by dividing the amount of his or her monthly benefit check by the federal minimum wage. For example, at a minimum wage of $2 per hour, the recipient would have had to work 50 hours to receive $100 in benefits.

The agency itself supervised the workfare recipient's performance in the job; kept a tally of his or her hours; and reported to the county whether the recipient had, or had not, worked the required number of hours each month. However, the County, not the agency, paid the recipient and the agency did not reimburse the County for such payments. If the recipient failed or refused to work the requisite number of hours and the County found that such failure or refusal was unjustified, the County would terminate the recipient's benefits.

In May 1971, respondent, Francis P. Conroy, applied to the County for general assistance benefits. Since he was able to work, the county assigned him to the workfare program. Conroy began working pursuant to the County's assignment and in turn received monthly benefit checks of about $100.

In July and August 1971, the County assigned Conroy to work for the Inglewood Unified School District (District) as a watchman. To receive his benefits, Conroy had to work for seven or eight hours per day, seven days per month. The District assigned Conroy to Morningside High School, where he worked under the supervision of the chief custodian.

On August 12, 1971, while on a meal break, Conroy fell from a chair in the lunchroom. He was sitting with the chair tilted back when the legs slipped out from under him and he fell. His head and back hit the concrete floor and his arm was cut on a piece of broken glass.

After the accident, Conroy suffered persistent backaches, recurring headaches, and shooting pains in his right leg. As a result, he did not report for work. When the County asked why he was not working, he explained that his injuries prevented him from doing so. The County continued to send Conroy his monthly benefit check.[1]

---

[1]The county reduced his benefits by $8 per month. A County employee told Conroy that the reason for the deduction was that he was not working.

In 1976, Conroy filed a claim for workers' compensation benefits based on the injury he suffered while working at the Morningside High School.[2]

The County contested his claim, arguing that at the time he was injured, Conroy did not qualify as an employee under the Workers' Compensation Act (Lab. Code, § 3200 et seq.)[3] and was, therefore, not entitled to benefits. The County argued in the alternative that even if Conroy did qualify as an employee, the County was not liable since he was an employee of the District, not the County.

The workers' compensation judge rejected both of the County's contentions and awarded Conroy temporary and permanent disability benefits totalling $1,800. The judge did, however, allow the County to offset the welfare payments it had made to Conroy against this award. The Workers' Compensation Appeals Board (Board) denied the County's petition for reconsideration, noting that it had previously held that an indigent who is required to work as a condition of receiving welfare benefits qualifies as an employee. (*County of Los Angeles* v. *Workmen's Comp. Appeals Bd.* (*Duke*) (1974) 39 Cal.Comp.Cases 809.) The County now seeks review of the Board's decision.

## II.

An employer-employee relationship must exist in order to bring the Workers' Compensation Act into effect. (§ 3600.) An "employee" is defined as "every person in the service of an employer under any appointment or contract of hire or apprenticeship, express or implied, oral or written . . . ." (§ 3351.) In *Laeng* v. *Workmen's Comp. Appeals Bd.* (1972) 6 Cal.3d 771, 776-777 [100 Cal.Rptr. 377, 494 P.2d 1], this court held that section 3351 defines the term "employee" broadly. A person who renders service to another is presumed to be an "employee." (§ 3357.)

(1) The *Laeng* court indicated that an asserted employment relationship must be considered in light of the legislative mandate to construe these statutes liberally in favor of awarding compensation. (*Laeng, su-*

---

[2]At or about the time Conroy filed this claim, the County terminated his general assistance benefits.

[3]All statutory references are to the Labor Code unless otherwise indicated.

pra, 6 Cal.3d at pp. 777-778. See § 3202.) "[A]n 'employment' relationship sufficient to bring the act into play *cannot* be determined simply from technical contractual or common law conceptions of employment but must instead be resolved by reference to the history and fundamental purposes underlying the Work[ers'] Compensation Act." (*Laeng, supra*, 6 Cal.3d at p. 777, citations and fn. omitted, italics added.)

In *Laeng*, a job applicant had been injured while performing a physical agility test as a "tryout" for a city refuse crew job. In determining whether an employment relationship existed, the court focused on whether the applicant had performed a service for and had conferred a benefit on the city. (*Id.*, at pp. 780-783.) The court found that he had done so, since the tryout test enabled the city to select better qualified employees. During the test, the applicant subjected himself to the city's control and the city directed his activities. In that sense as well, the applicant was in the service of the city. Finally, the court noted that the Workers' Compensation Act is intended to protect against the special risks of employment. That purpose was served by granting compensation benefits, since the tryout test was designed to correlate with the skills required on the job. The test thus included special risks similar to those inherent in the job itself.

(2) The County contends that despite the import of the statutory provisions and the language found in *Laeng*, this court should deny respondent any benefits. Relying on the 47-year-old case of *McBurney* v. *Industrial Acc. Com.* (1934) 220 Cal. 124 [30 P.2d 414], the County argues that a contract of employment was essential to establish any right to compensation. In the *McBurney* case, this court denied benefits because the worker's relationship to the county was "in the field of public welfare" and as a result no contract of employment was present. (*Id.*, at pp. 127-128.)

The *McBurney* case presents some interesting questions. For example, it is not entirely clear whether the worker in *McBurney* was required to work in order to receive welfare benefits. The discussion of this point in *McBurney* is contradictory. The court twice stated that work was required as a condition of receiving welfare benefits (*id.*, at pp. 125, 126), but also noted that the indigent "would receive the relief whether he worked or not" (*id.*, at p. 128).

However, the Courts of Appeal ignored the contradictory language in *McBurney*. They interpreted *McBurney* as holding that an indigent who is required to work in order to receive welfare benefits is not an employee under the Workers' Compensation Act. (*Los Angeles Co. v. Indus. Acc. Com.* (*Jones*) (1934) 2 Cal.App.2d 614, 615 [38 P.2d 828]; *Board of Education* v. *Indus. Acc. Com.* (*Stout*) (1934) 3 Cal.App.2d 411, 414 [39 P.2d 521].)

A threshold question is whether *McBurney*, as interpreted by the Courts of Appeal, has continuing validity since it relies upon an overly restrictive definition of the employment relationship under the Workers' Compensation Act. The statutory definition of employee includes, "every person in the service of an employer under any appointment *or* contract of hire . . . ." (§ 3351, italics added.) Unfortunately, in *McBurney* this court ignored the use of the disjunctive word "or," and simply restricted the definition to those situations where a contract for hire was present.[4] This does not square with the plain meaning of the statute. *McBurney* is also inconsistent with this court's ruling in *Laeng*, where a contract for hire was held not to be a prerequisite to the establishing of an employment relationship under the Workers' Compensation Act.

If the principles of *Laeng* are applied to the present case, it is clear that respondent was an employee of the County under the Workers' Compensation Act. Even more so than the job applicant in *Laeng*, respondent was in the service of the County when he was injured. He performed the job of watchman on the grounds of a school. Similar to the applicant in *Laeng*, respondent subjected himself to the County's control. The County, though it did not directly supervise his day-to-day activities, exercised its right of control by assigning him to jobs. Also, the County determined respondent's rate of pay, specified the number of hours he was to work, and had the sole power to terminate his bene-

---

[4] The court also erred in concluding in *McBurney* that no contract of hire existed. When the county offered work to an indigent, it did so voluntarily: "though the city was required to furnish relief it was not under any duty to embark upon a work program." (Polier & Donner, *The Status and Rights of Injured Relief Workers* (1936) 36 Colum.L.Rev. 555, 589 [hereinafter Polier & Donner]; see also *Vaivida* v. *City of Grand Rapids* (1933) 264 Mich. 204 [249 N.W. 826, 828], dis. opn.) The indigent's participation in the work program was also voluntary. "The fact that he will forego relief if he discontinues working does not make his employment compulsory. In all fields of endeavor work is a condition precedent to remuneration." (Comment, *Relief Workers and Workmen's Compensation* (1942) 36 Ill.L.Rev. 773, 776.) Therefore, both parties were free to contract for employment.

fits if he did not perform his work to the County's satisfaction.[5] The County received a benefit from respondent's work, which helped to ensure the safety of a school within the County's boundaries. Finally, by assigning respondent to work at the school, the County exposed him to the same risks of employment faced by similar school employees. The special risks inherent in employment are the very dangers the workers' compensation laws are intended to cover.[6]

*Laeng* makes it clear that the *McBurney* court erred in insisting upon a showing of a contract for hire to establish an employment relationship under the Workers' Compensation Act. Persuasive scholarly authority and decisional law from other states demonstrate that *McBurney* also erred in relying upon an outmoded social philosophy under which workfare participants[7] were treated as paupers or wards.

*McBurney* was one of a series of Depression-era cases which held that workfare participants were not employees under state workers' compensation acts. (See generally Annot., Needy Persons Put to Work by Municipality or Other Public Body as Means of Extending Aid to

---

[5]The County disputes that respondent was required to work in order to receive welfare benefits. It points to the fact that respondent continued to receive welfare checks after he was injured and stopped working. However, that fact does not prove that the County did not have a work requirement for *able-bodied* indigents. The County's own employee testified in the proceedings below that the County would not pay welfare benefits if an able-bodied applicant refused to work. This testimony is sufficient to show that respondent was required to work in order to receive welfare benefits.

[6]At oral argument, counsel for the County stated that permanent disability benefits are intended to compensate injured workers for the loss of their ability to compete in the open labor market. Counsel argued that this purpose would not be served in the present case, since respondent had never worked in the open labor market. Counsel contended that the County should not be required to pay workers' compensation benefits in order to rehabilitate persons who had never worked.

However, whether respondent had been an employee *before* his assignment to the workfare program is irrelevant to the issue of whether he was an employee of the County *under* the workfare program. The County's argument leads to the absurd conclusion that all workers injured in their first jobs should be denied workers' compensation benefits because they have not previously competed in the labor market. Clearly, this result would contravene the intent of the Workers' Compensation Act to protect workers against the risks of employment (*Laeng, supra,* 6 Cal.3d at p. 782).

Further, the record is clear. Respondent worked as a laborer or gardener for several private businesses and a public agency between 1956 and 1969.

[7]During the Depression, government agencies established programs which provided jobs to millions of unemployed indigent persons. (See Polier & Donner, *supra,* at pp. 562-563.) These were called work relief programs, but were structured in a manner similar to the workfare program in the present case. Applicants requested aid from the agency, which assigned them to work projects and paid them for their services.

Them as Within the Protection of Workmen's Compensation Act (1935) 96 A.L.R. 1154, 1155-1163, supp. in (1940) 127 A.L.R. 1483, 1484-1487; Polier & Donner, *supra*, at pp. 575-581; Comment (1938) 36 Mich.L.Rev. 690, 691.) At the time, these cases represented the majority view regarding the status of workfare participants. (Polier & Donner, *supra*, at p. 581.)

The rationale underlying *McBurney* had its roots in the Elizabethan Poor Law. (Polier & Donner, *supra*, at pp. 587-590.) The poor law was brought to this country by the earliest settlers and its basic tenets were adopted in California in 1901. (Stats. 1901, ch. 210, p. 636. See tenBroek, *California's Dual System of Family Law: Its Origin, Development, and Present Status, Part I* (1964) 16 Stan.L.Rev. 257, 258, 291; *Part II* (1964) 16 Stan.L.Rev. 900, 939 [hereinafter tenBroek].) Under the poor law, each community was required to support its poor. (*Id., Part I*, at pp. 262-265.) The poor were classified with such groups as the aged and blind. (Polier & Donner, *supra*, at pp. 587-588.) The able-bodied poor were required by law to work in local community projects. (tenBroek, *supra, Part I*, at p. 259.) As part of this program, those who refused to work were sent to houses of correction for punishment and reform. (*Id.*, at pp. 259, 277-278.)

The work requirement was set up to minimize public expenditures for the poor. (*Id.*, at pp. 276, 278-279.) Further, it reflected the prevalent view that idleness was a vice which was "a result of a personal choice rather than economic conditions. Based on personal fault it was personally correctable if only the will were instilled." (*Id.*, at p. 277.)

The poor law concept of the disfavored status of the poor, and the punitive sanctions placed upon them for their status, found expression in *McBurney* and in cases from California and other jurisdictions. Those cases held that workfare participants were not employees under the workers' compensation statutes. Indigents who were given government work were treated like paupers. (*State ex rel. State Board of Charities and Public Welfare v. Nevada Industrial Commission* (1934) 55 Nev. 343 [34 P.2d 408]; *Jackson v. North Carolina Emergency Relief Administration* (1934) 206 N.C. 274 [173 S.E. 580, 581].) The money and goods given to them were deemed to be not pay for their work, but an act of grace by the chosen, the nonidle. The work assigned to them was characterized as "a form of charity." (*County of Los Angeles v. Indus. Acc. Com. (Hauser)* (1934) 140 Cal.App. 727, 728 [35 P.2d 1035].)

Deeming indigents to be wards of the local governments, the *McBurney* court referred to the work requirement as a test of the indigent's "sincerity and good faith ..., or the opposite" and as a means of relieving him or her "of the odium of idleness." (220 Cal. at p. 128.) Workfare participants were thus viewed as charity cases, suffering from the same legal disabilities and social opprobrium which attached to indigents who did not work. Their disfavored status was justified by the fact of their indigency. Moreover, the need for a test of their sincerity was evidence that they were seen as personally responsible for their unemployment and poverty.

A more enlightened view of the problem of indigent workfare participants surfaced during the Depression in a number of court decisions. A respectable minority of courts (including, ironically, the courts in England, where the poor law originated) held that these workers were employees for the purposes of workers' compensation. (See generally Annot., *supra*, 96 A.L.R. at pp. 1163-1166, supp. in 127 A.L.R. at pp. 1487-1492; Polier & Donner, *supra*, at pp. 573-575; Comment, *supra*, 36 Mich.L.Rev. at p. 691.)

As one court noted, work relief is not the same as direct relief: "It seems much more reasonable ... to distinguish between those who work for their support and those who do not work for their support than to distinguish between laborers engaged in the same work, paid at the same rate, some of whom are employed directly by the city and some indirectly through the relief agency.... [¶] "[T]o treat relief workers as public wards would weaken the incentive to accept work when it is offered. The purpose of the [work-relief] law is to keep men occupied in gainful occupations so that they may not become idle paupers.... [¶] It seems to this court more in harmony with the spirit of work-relief legislation to hold the claimant to be an employee than to hold him to be a pauper or ward. A sound public policy prompts the efforts of the state to preserve the self-reliance of its citizens, even if at extra expense.... The state recognizes that many of its citizens are indigent, but it still wishes them to be independent. The relief legislation was enacted with that purpose in view.... The evolution of public welfare has been from public 'charity' toward social justice. Courts should facilitate such development by an enlightened and liberal interpretation of all welfare laws." (*Industrial Commission of Ohio* v. *McWhorter* (1934) 129 Ohio St. 40 [193 N.E. 620, 622-623, 96 A.L.R. 1150]. See also *Hattler* v. *Wayne County* (1936) 320 Pa. 280 [182 A. 526, 527]; *Vaivida* v. *City of Grand Rapids, supra*, 249 N.W. at p. 828-829, dis. opn.)

The views espoused in *McBurney* were harshly criticized by legal scholars. It was noted that unlike the poor laws, work relief programs were not intended to discipline or to reform the poor. Rather, the purpose was to relieve hardship in an era of widespread unemployment caused by economic conditions, not by a personal character flaw. (Polier & Donner, *supra,* at p. 593; Note (1940) 9 Geo.Wash.L.Rev. 205, 207.) The work provision was also intended to maintain the independence and self-reliance of persons who but for economic conditions would be employed. (Comment, *supra,* 36 Ill.L.Rev. at p. 782; Polier & Donner, *supra,* at p. 562.) In criticizing *McBurney* and its progeny, commentators have pointed out that "[p]aradoxically the California courts concede that the purpose in creating the relationship [between the relief worker and the governmental unit for whom he worked] was to 'avert the stigma of pauperism' and then deny that the parties have succeeded in doing so." (Polier & Donner, *supra,* at p. 590, fn. omitted.) Thus, workfare participants should not have been treated as disfavored paupers merely because they needed to accept work from the government in order to keep from starving.

Today the requirement that a welfare recipient work for his or her benefits is not the recognition of a dole but is presumably intended to enhance the independence and self-respect of welfare recipients. (See Welf. & Inst. Code, § 17200.)[8] The work requirement is not intended to punish the indigent. One state court has recently rejected the view of *McBurney* and held that there is "no sound reason for discriminating against a poor relief worker who may be injured while working shoulder to shoulder with a regular county employee who would be entitled to benefits . . . ." (*Scissons* v. *City of Rapid City* (S.D. 1977) 251 N.W.2d 681, 687.) The court found that the view that workfare participants are employees was "more enlightened." (*Ibid.*)

The *McBurney* decision represents a paternalistic and even oppressive social philosophy. It contravenes the policy of encouraging independence and self-respect among indigent workers. Since it is also based on the erroneous notion that the essentials of a contract for hire are re-

---

[8]This section provides: "Work may be required of an indigent, who is not incapacitated by reason of age, disease, or accident, as a condition of relief. Such work shall be created for the purpose of keeping the indigent from idleness and assisting in his rehabilitation and the preservation of his self-respect."

quired under the Workers' Compensation Act, the *McBurney* case is overruled and its progeny[9] are disapproved.

The County contends that section 3352, subdivision (b) provides an independent basis for concluding that respondent is not an employee. Section 3352, subdivision (b) excludes from the definition of an employee "[a]ny person performing services in return for aid or sustenance only, received from any religious, charitable, or relief organization." The County relies on several Court of Appeal cases which have held that an indigent who worked for a public entity for welfare benefits was excluded by the predecessor statute of section 3352.[10] (*Jones, supra,* 2 Cal.App.2d at p. 615, followed in *Christensen, supra,* 3 Cal.App.2d at p. 533; *Stout, supra,* 3 Cal.App.2d at p. 414.) The County contends that the Legislature implicitly approved the *Jones* court's interpretation of the predecessor statute of section 3352, subdivision (b), since the Legislature failed to repeal or amend the substantive portions of that statute after *Jones* was decided.[11]

However, mere legislative inaction cannot preclude this court from re-examining the validity of *Jones* and the cases following it. (See *People* v. *Daniels* (1969) 71 Cal.2d 1119, 1127-1128 [80 Cal.Rptr. 897,

---

[9]The Court of Appeal cases which followed the holding of *McBurney* include: *Martin* v. *Indus. Acc. Com.* (1934) 137 Cal.App. 771 [30 P.2d 527]; *Rico* v. *Indus. Acc. Com.* (1934) 137 Cal.App. 772 [30 P.2d 584]; *County of Los Angeles* v. *Indus. Acc. Com.* (*Hauser*) (1934), *supra,* 140 Cal.App. 727; *San Bernardino Co.* v. *Indus. Acc. Com.* (*Barnes*) (1934) 1 Cal.App.2d 598 [37 P.2d 122]; *Los Angeles Co.* v. *Indus. Acc. Com.* (*Jones*) (1934) *supra,* 2 Cal.App.2d 614; *City of Long Beach* v. *Indus. Acc. Com.* (*Evans*) (1934) 2 Cal.App.2d 641 [38 P.2d 850]; *Board of Education* v. *Indus. Acc. Com.* (*Stout*) (1934) *supra,* 3 Cal.App.2d 411; *State Comp. Ins. Fund* v. *Indus. Acc. Com.* (*Christensen*) (1935) 3 Cal.App.2d 532 [39 P.2d 870]; *State Comp. Ins. Fund* v. *Indus. Acc. Com.* (*Phillips*) (1935) 3 Cal.App.2d 665 [40 P.2d 277]; *County of Los Angeles* v. *Indus. Acc. Com.* (*Munguia*) (1934) 3 Cal.App.2d 754 [39 P.2d 477]; *State Comp. Ins. Fund* v. *Indus. Acc. Com.* (*Stock*) (1935) 3 Cal.App.2d 756 [40 P.2d 278]; *City of Los Angeles* v. *Indus. Acc. Com.* (*Wolf*) (1935) 8 Cal.App.2d 580 [47 P.2d 1096].

[10]The predecessor to section 3352, subdivision (b) was section 8a of the Workmen's Compensation Act. It became effective before *McBurney* was decided. (Stats. 1933, ch. 1022, § 1, p. 2613, eff. Oct. 25, 1933.) It was not mentioned in *McBurney* because the injury there occurred before the effective date of the statute.

[11]Section 8a of the Workmen's Compensation Act, the predecessor statute of section 3352, subdivision (b), provided in relevant part: "The term 'employee' ... shall be construed to ... exclud[e] any person or persons who perform services in return for aid or sustenance only, received from any religious, charitable or relief organization ...." (Stats. 1933, ch. 1022, § 1, p. 2613.) This language is virtually identical to that of section 3352, subdivision (b). (See above.)

459 P.2d 225, 43 A.L.R.3d 677].) The Legislature's failure to act may indicate many things other than approval of a judicial construction of a statute: the """sheer pressure of other and more important business,""" """political considerations,""" or a """tendency to trust to the courts to correct their own errors ...."""" (*Id.*, at p. 1127, fn. 4, quoting from *Cleveland* v. *United States* (1946) 329 U.S. 14, 23 [91 L.Ed. 12, 19, 67 S.Ct. 13], conc. opn. of Rutledge, J.)

The significance of the Legislature's failure to act is diminished even further by the fact that there is no evidence that the *Jones* court's interpretation of the predecessor statute of section 3352, subdivision (b) was ever brought to the Legislature's attention. (2A Sutherland, Statutory Construction (4th ed. 1973) § 49.10, pp. 261-262.)

*Jones* and the cases following it fail to analyze the meaning of a "relief organization" under section 3352, subdivision (b).[12] They simply assume that the exclusion of workfare participants, as established in *McBurney*, was part of the statute as well. Since *McBurney* was erroneously decided, that interpretation of the statute was also incorrect.

Absent *McBurney*, there is no support for the County's claim that section 3352, subdivision (b) excludes respondent from the status of an employee. The statute's reference to a "religious, charitable, or relief organization" appears to contemplate only private, not public, entities.[13] (See Polier & Donner, *supra*, at p. 591, fn. 155, citing 1 Campbell, Workmen's Compensation Law (1935) § 437.) Since the statute does

---

[12]In fact, *Jones* ignored the second phrase of the statute entirely, finding that the worker was excluded from the status of an employee merely because he worked "'for aid or sustenance only.'" (2 Cal.App.2d at p. 615.) If that rationale were adopted, it would exclude many nonindigent workers as well, since large numbers of people probably work "for sustenance only."

[13]The exclusion of charities from workers' compensation coverage may have been based on notions underlying the doctrine of charitable immunity. (Cf. *Hartford A. & I. Co.* v. *Indus. Acc. Com.* (1934) 139 Cal.App. 632, 640 [34 P.2d 826]: "the trend of the decisions ... is toward a construction that ... exempts charitable corporations from the operation of the law as applied to individuals, or to the ordinary business corporations.... [T]he presumption must be that the legislature intended that the exemption that existed at common law should not be disturbed [in the workers' compensation context].") However, the doctrine of charitable immunity has long been rejected in this state. (See 4 Witkin, Summary of Cal. Law (8th ed. 1974) Torts, § 159, pp. 2449-2450.) Therefore, the basis for the exclusion of charities from workers' compensation coverage may never have existed. (See Polier & Donner, *supra*, at p. 582, fn. 123.)

not "unmistakably" exclude public welfare agencies from workers' compensation coverage, it should not be so interpreted.[14] (*Lacoe v. Indus. Acc. Com.* (1930) 211 Cal. 82, 86 [293 P. 669].) To do so would contravene the legislative requirement that the workers' compensation statutes are to be liberally construed in favor of awarding benefits. (§ 3202.)

The Board stated it well in the proceedings below. The County has a statutory duty to provide support to indigent residents (Welf. & Inst. Code, § 17000), but private charitable organizations do not. Therefore, the County, unlike a private charity, cannot be discouraged from providing aid by the requirement of paying workers' compensation benefits.

The Board correctly held that respondent was an employee within the meaning of the Workers' Compensation Act.[15]

### III.

Finally, the County contends that the District, not the County, was respondent's employer. It is argued that the State Compensation Insurance Fund (the District's insurer against workers' compensation liability) is solely liable for respondent's benefits.

The law is clear. If one employer (the general employer) sends an employee to work for another party (the special employer) and both have the right to control the employee's activities, a dual employment exists. (*Marsh v. Tilley Steel Co.* (1980) 26 Cal.3d 486, 494-495 [162 Cal.Rptr. 320, 606 P.2d 355]; *Kowalski v. Shell Oil Co.* (1979) 23 Cal.3d 168, 174 [151 Cal.Rptr. 671, 588 P.2d 811].) In that situation, both the general and special employers are liable for any injuries to the employee. (*Kowalski, supra,* 23 Cal.3d at p. 175; *Ridgeway v. Industrial Acc. Com.* (1955) 130 Cal.App.2d 841, 846-847 [279 P.2d 1005].)

---

[14]To rule otherwise would result in several anomalies. For example, respondent and other workers in county welfare programs would be denied benefits, while workers in certain federal economic opportunity programs are eligible for benefits. (§ 4207.) Even state prison inmates injured while performing assigned work are entitled to receive benefits. (§ 3370.)

[15]In view of this conclusion, it is unnecessary to address respondent's contention that he is entitled to benefits under the terms of section 4456, which sets out the method of calculating disability payments to an employee who "is injured while engaged on any unemployment work relief program conducted by the State, or a political subdivision . . . ."

Here, the County was the general employer. It sent respondent to work for the District, the special employer. The District supervised respondent's day-to-day activities as a watchman. The County retained the right to control other aspects of respondent's work: whether to accept him as a worker, where to assign him, and whether to discharge him. Since the County and the District maintained joint control over respondent's work, ordinarily the insurers of both would be liable for the benefits awarded to him.

However, Insurance Code section 11663 makes the County solely liable for respondent's benefits. That statute provides that "[a]s between insurers of general and special employers," the insurer of a general employer is solely liable for workers' compensation benefits arising out of general and special employments unless the special employer had the employee on its payroll at the time of the injury. The statute also provides that if an employer is legally uninsured, as is the County (see § 3700), it is deemed to be the insurer of its own liability.[16] Here, the County, not the District, paid respondent. Therefore, the County, as insurer of its own general employment liability, was solely liable for respondent's benefits.

### IV.

In conclusion, a workfare recipient is in a position no different from that of any other employee covered by worker's compensation. He or she performs services in order to earn a living, and encounters all of the risks of employment faced by other employees. Therefore, the workfare recipient must be held to be an employee under the Workers' Compensation Act.

This court cannot deny respondent benefits on the basis of *McBurney's* characterization of the workfare recipient as a public ward. *McBurney* embodied a paternalistic social philosophy that is plainly inconsistent with the purpose of the workers' compensation statutes: to

---

[16]Insurance Code section 11663 provides in full: "As between insurers of general and special employers, one which insures the liability of the general employer is liable for the entire cost of compensation payable on account of injury occurring in the course of and arising out of general and special employments unless the special employer had the employee on his pay roll at the time of injury, in which case the insurer of the special employer is solely liable. For the purposes of this section, a self-insured or lawfully uninsured employer is deemed and treated as an insurer of his workmen's compensation liability."

protect individuals from the inherent risks of employment. *McBurney* is overruled.

Respondent is an employee within the meaning of the Workers' Compensation Act. The award of the Board is affirmed.

Tobriner, J., Mosk, J., Richardson, J., Newman, J., Kaus, J., and Broussard, J., concurred.

Petitioner's application for a rehearing was denied February 10, 1982.