Donald CHILDS, Appellant,

v.

**KALGIN ISLAND LODGE & Fireman's Fund Insurance Companies, State of Alaska, Workers' Compensation Board, Appellees.**

No. S–3012.

Supreme Court of Alaska.

Aug. 4, 1989.

Ernest Z. Rehbock, Rehbock & Rehbock, Anchorage, for appellant.

Allen E. Tesche and Susan L. Daniels, Russell & Tesche, Anchorage, for appellees.

Before MATTHEWS, C.J., and RABINOWITZ, BURKE, COMPTON and MOORE, JJ.

## OPINION

COMPTON, Justice.

The issue in this appeal is whether the Alaska Workers' Compensation Board (Board) applied the correct legal test in deciding that Donald Childs was not an employee of Kalgin Island Lodge (Lodge) after he performed various work-related tasks for the Lodge. Childs claims that he was injured in an auto accident while employed by the Lodge. He filed a claim under the Alaska's Workers' Compensation Act (Act), but was denied coverage by the Board. It concluded that Childs had no contract of hire with the Lodge because the formal hiring process was not complete, and no contract could be implied because no emergency situation existed.

Childs appealed to the superior court, which affirmed the Board's decision. It noted that "all steps of the interview and negotiation process must be complete" before an employee/employer relationship could be formed.

### I. FACTS AND PROCEEDINGS

In July 1986, Childs, a professional pilot, sought employment with the Lodge as a pilot and guide. In order to obtain employment, Childs contacted Charles Tulin (Tulin), who interviews and recommends pilots to be employed by the Lodge. Even though Tulin was not the owner of the business which operated the Lodge, he apparently owned certain Lodge facilities and was the co-owner of the real property, improvements and equipment used by the Lodge, including all airplanes.

The Board found that the final hiring decisions normally rested with the Lodge's corporate president and board of directors. It is unclear, however, whether Tulin also had authority, actual or apparent, to hire Childs without their prior approval. However, it is clear from the record that Tulin's recommendations to the Lodge regarding hiring were given at least great weight and would be seriously considered. The corporate president and owner of the business was Tulin's son, Don Tulin.

On or about June 30, 1986, Tulin requested that Childs come to Tulin's law office for an interview. Following the interview, Tulin asked Childs to call him after the July 4th weekend. Childs called as instructed and was invited to lunch on July 7, 1986.

Childs testified that at lunch, Tulin offered to employ him for $3,500 per month, which he accepted. Tulin testified that no such offer was made. Tulin instructed Childs to report to his office the next day. Childs did so. At this time, Tulin informed the insurance agent for the Lodge, both by mail and by phone, that Childs should be added to the Lodge's insurance coverage. Tulin directed Childs to hand-carry the insurance agent's letter to the post office to insure prompt delivery and response, which Childs did.

Later that day, at Tulin's request, Childs drove to Lake Hood, where Tulin introduced Childs to various Lodge employees. While there, Childs assisted in loading a plane for a flight to the Lodge, pumped the plane's floats and filled it with 25 gallons of fuel. He then signed for the fuel on behalf of the Lodge. Childs testified that on this occasion, he was instructed to inspect the Lodge's planes and begin making a list of the repairs that needed to be completed for the upcoming winter. He further testified that he was instructed to begin setting up maintenance schedules for the Lodge's planes and programs for pilot selection and training. Later that day, Childs gassed and changed the oil on another of the Lodge's airplanes. He paid for the gas and oil with a Lodge check, given him by Tulin's wife.

Childs was informed by Tulin that he would accompany Tulin out to the Lodge on either July 10 or July 11. On July 10, Childs prepared gear and readied himself for the trip to the Lodge. He was told the trip would be the following day.

On July 11, 1986, Tulin introduced Childs to Don Tulin. Childs testified that he was instructed by both men to use Tulin's law

office facilities to work on a marketing program for the Lodge. At this time, Childs made several phone calls in furtherance of marketing for the Lodge.

At about 4 p.m., Childs either volunteered or was asked by Tulin to go to a sporting goods store to pick up two fishing rods. The rods were to be bought with a personal check from Tulin. On the way to the store, while driving Tulin's car, Childs was involved in an auto accident and was injured. He filed a worker's compensation claim after submitting his Notice of Occupational Injury to Tulin.

After depositions and hearings, the Board denied Childs' claim. The Board based its decision on its conclusion that no express contract existed between the Lodge and Childs, because not all of the formal hiring process had been completed at the time of the accident. The Board further concluded that because no emergency situation existed during the time in question, Childs was not an emergency employee and therefore could not receive the benefits of the Act. One member of the Board dissented on the ground that Childs was in a "tryout" period and the Act's coverage should apply under the emergency exception.

Childs appealed to the superior court, which affirmed the Board's decision. The court concluded that the Board applied the correct law and that there was substantial evidence [1] to support its findings of fact. Thus, because no emergency existed and no express contract was made, no relationship existed between the parties which would entitle Childs to coverage under the Act. Therefore, the superior court concluded that workers' compensation benefits were properly denied, and the Board's decision was affirmed. Childs appeals.

## II. DISCUSSION

■ To determine the issue presented before this court, we need only consider whether the Board applied the proper legal

---

1. "Substantial evidence" is defined as relevant evidence which a reasonable mind might accept as adequate to support a conclusion. *Bailey v.* *Litwin Corp.,* 713 P.2d 249, 252 (Alaska 1986) (citing *Miller v. ITT Arctic Servs.,* 577 P.2d 1044, 1046 (Alaska 1978)).

test to reach its conclusions.[2] *Ostrem v. Alaska Workmen's Compensation Bd.*, 511 P.2d 1061, 1063 (Alaska 1973); *Burgess Construction Company v. Smallwood*, 623 P.2d 312, 317 (Alaska 1981). This court has consistently maintained that it will not vacate findings of the Board when supported by substantial evidence. However, if the Board's decision rests on an incorrect legal foundation, review is not so limited. *Hewing v. Alaska Workmen's Compensation Bd.*, 512 P.2d 896, 898 (Alaska 1973). In such cases, independent review of the law is proper. *Simon v. Alaska Wood Prods.*, 633 P.2d 252, 254 (Alaska 1981); *M–K Rivers v. Schleifman*, 599 P.2d 132, 134 (Alaska 1979).

The Act provides that an employee is a person employed by an employer, and an employer is, in part, "a person employing one or more persons in connection with a business or industry."[3]

▇▇▇ The Board correctly recognized that before an employee/employer relationship exists under the Act, an express or implied contract of employment must exist. *Whitney–Fidalgo Seafoods, Inc. v. Beukers*, 554 P.2d 250, 252 (Alaska 1976). The Board also correctly recognized that employment *generally* begins after a meeting of the minds has been reached between the employee and the employer, for it is at that point that a contract is formed. *See* 1C A. Larson, *The Law of Workmen's Compensation* § 47.10 (1986) (hereinafter Larson). Furthermore the Board correctly noted that volunteer work, standing alone, does not necessarily establish an employee/employer relationship for the purposes of the Act. *See City of Seward v. Wisdom*, 413 P.2d 931, 936–37 (Alaska 1966).

However, in applying the above law the Board incorrectly concluded that employee/employer relationships exist only when an express contract for hire is finalized by completion of the hiring process, or an implied contract is formed based on emergency circumstances. The superior court followed the same analysis.

Situations arise in which employee/employer relationships exists without either an express contract or an emergency situation. *See, e.g., County of Los Angeles v. Workers' Compensation Appeals Bd.*, 30 Cal.3d 391, 179 Cal.Rptr. 214, 637 P.2d 681 (1981); *Laeng v. Workmen's Compensation Appeals Bd.*, 6 Cal.3d 771, 100 Cal. Rptr. 377, 494 P.2d 1 (1972); *Moore v. Gundelfinger*, 56 Mich.App. 73, 223 N.W.2d 643 (1974); *Smith v. Venezian Lamp Co.*, 5 A.D.2d 12, 168 N.Y.S.2d 764 (1957). *See also* 1C Larson § 47.42(b). This court has never declared that express contracts are formed only after the formal hiring process is complete, nor have we adopted the view that only emergency situations may sustain implied contracts for hire. Because it is obvious that the Board failed to apply the correct legal analysis under which an employee/employer relationship can be created, we must remand the case to the Board for consideration in light of the following.

## A. EXPRESS CONTRACT.

▇▇ As noted in *Fjeldahl v. Homer Co-op. Ass'n*, 11 Alaska 112, 135 (D. Alaska 1946), "to employ" means to make use of the services of another. "To be employed in anything means not only the act of doing it, but also to be engaged to do it; to be under contract or orders to do it." *Id.* (citations omitted). We agree with the holding of the New Mexico Supreme Court that mere formalization of a contract for hire is not the controlling factor in determining whether an employment contract exists. *Roan v. D.W. Falls, Inc.*, 72 N.M. 464, 384 P.2d 896, 899 (1963). *See generally* 9 W. Jaeger, *Williston on Contracts*

---

**2.** Even though the facts were disputed before the Board, at oral argument counsel for the Lodge conceded that Childs performed all the work he alleged. No factual dispute remains before the court.

**3.** AS 23.30.265 provides in part:

(12) "employee" means an employee employed by an employer as defined in (13) of this section;

(13) "employer" means the state or its political subdivision or a person employing one or more persons in connection with a business or industry coming within the scope of this chapter and carried on in this state.

§ 1012 (3d ed. 1967); 1 *id.* §§ 3, 3A, 36, 36A, 39 (3d ed. 1957).

The formation of an express contract requires an offer encompassing its essential terms, an unequivocal acceptance of the terms by the offeree, consideration and an intent to be bound. *Hall v. Add-Ventures, Ltd.*, 695 P.2d 1081, 1087 n. 9 (Alaska 1985) (citing 1 W. Jaeger, *Williston on Contracts* § 64, at 211, § 72, at 235, § 73, at 128 (3d ed. 1957)).

The Board failed to determine whether Tulin had authority to hire Childs. If so, the Board failed to determine whether Tulin offered Childs a pilot/guide position for $3,500 a month and whether Childs accepted Tulin's offer. The Board also failed to consider the possibility that Childs offered to work for Tulin or the Lodge at $3,500 per month, and Tulin accepted. The Board's failure to determine whether an offer and acceptance was made, regardless of whether the formal hiring process was complete, leads us to conclude that the correct express contract analysis was not considered.[4]

### B. IMPLIED CONTRACT.

An implied employment contract is formed by a relation resulting from "the manifestation of consent by one party to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." 9 W. Jaeger, *Williston on Contracts* § 1012, at 4–5 (3d ed. 1967) (quoting *Zehr v. Wardall*, 134 F.2d 805 (6th Cir.1943)). *Cf. Martens v. Metzgar*, 524 P.2d 666, 672 (Alaska 1974).

The Board should make its determination whether an implied contract was formed by considering all the factors in light of the surrounding circumstances. *See City of Seward*, 413 P.2d at 936 n. 13. This court has adopted the position that

"[o]rdinarily no single feature of the relation is determinative ... and each case must depend upon its own facts." *Id.* (citing *Crepps v. Industrial Comm'n*, 402 Ill. 606, 85 N.E.2d 5, 9 (1949)). Furthermore, words and acts of the parties should be given such meaning as reasonable persons would give them under all the facts and circumstances present at the time in question. *Cf. Roan*, 384 P.2d at 899 (citing *Gomez v. Federal Stevedoring Co.*, 5 N.J. Super. 100, 68 A.2d 482 (App.Div.1941), and *Pavlantos v. Garoufalis*, 89 F.2d 203 (10th Cir.1937)).

There is sufficient evidence here from which it may be found that the Lodge employed Childs, even though no express contract is found. By utilizing his services and by controlling the time, manner and location of his work, the Lodge knowingly allowed Childs to act on its behalf, performing many of the job-related skills for which he was being considered.[5] The Board erred when it failed to consider these factors and their implications under the circumstances. Thus, the correct implied contract analysis was also not considered.

### C. TRYOUT EXCEPTION.

Finally, it is apparent that the Board failed to consider the tryout exception to the general rule that a contract for hire must exist before benefits can be awarded. "Since Workmen's Compensation law is primarily interested in the question when the risks of the employment begin to operate, it is appropriate, quite apart from the strict contract situation, to hold that an injury during a tryout period is covered, when injury flows directly from employment activities or conditions." 1A Larson § 26.20, at 5–299 (1985).

---

4. We note that an employer may not require a potential employee to offer free labor in hopes of obtaining future employment. *See* AS 23.10.-050; AS 23.10.065.

5. Even though Childs was being considered for a pilot/guide position and he never flew a Lodge plane, he did various other tasks associated with that position, including: unloading a car and loading a Lodge airplane; pumping an airplane float; fueling an airplane and signing for the fuel as a Lodge representative; changing the oil on another airplane and paying for the oil with a Lodge check; making marketing phone calls for the Lodge; and taking Tulin's car to locate fishing rods for Tulin.

The California Supreme Court, in deciding a similar case, concluded that the fundamental purpose of workmen's compensation is to protect individuals from the "special risks" of employment. *Laeng*, 494 P.2d at 8–9. Therefore, when an employer exposes potential employees to risks inherent in a tryout period and the applicant is under his direction or control, any injury resulting during such a period is compensable as a matter of law. *Id. See also Mansfield Enters., Inc. v. Warren*, 154 Ga.App. 863, 270 S.E.2d 72, 74 (1980); *Moore*, 223 N.W.2d at 648; *Venezian Lamp Co.*, 168 N.Y.S.2d at 766.

The Lodge argues that the tryout exception analysis is inappropriate to this case because Childs was on a personal errand for Tulin and the Lodge did not control the time, manner and method of work. We cannot accept this argument. These facts were disputed at the hearing and never decided by the Board.

It is not this court's task on review to reweigh conflicting evidence, or substitute its judgment for that of the Board. *Whaley v. Alaska Workers' Compensation Bd.*, 648 P.2d 955, 957 (Alaska 1982). Nor is it within the province of this court to reweigh witness credibility and competing inferences from testimony because those functions are reserved to the Board. *See Delaney v. Alaska Airlines*, 693 P.2d 859, 863 (Alaska 1985). Accordingly, this court may not ascertain the facts of this case. However, it is sufficient to note, as suggested by the dissenting board member, that a tryout period may have been initiated.

### III. CONCLUSION

The decision of the superior court is REVERSED and the case is REMANDED to the superior court with directions to remand it to the Board for further proceedings consistent with this opinion.